# MISTRETTA *v.* UNITED STATES

No. 87–7028.   Argued October 5, 1988—Decided January 18, 1989*

---

*Together with No. 87–1904, *United States* v. *Mistretta*, also on certiorari before judgment to the same court.

*Alan B. Morrison* argued the cause for petitioner in No. 87–7028 and respondent in No. 87–1904. With him on the briefs were *Patti A. Goldman, Raymond C. Conrad, Jr.,* and *Christopher C. Harlan.*

*Solicitor General Fried* argued the cause for the United States in both cases. With him on the brief were *Assistant Attorney General Bolton, Deputy Solicitor General Bryson, Paul J. Larkin, Jr., Douglas Letter, Gregory C. Sisk,* and *John F. De Pue.*

*Paul M. Bator* argued the cause for the United States Sentencing Commission as *amicus curiae* urging affirmance. With him on the brief were *Andrew L. Frey, Kenneth S. Geller,* and *John R. Steer.*†

JUSTICE BLACKMUN delivered the opinion of the Court.

In this litigation, we granted certiorari before judgment in the United States Court of Appeals for the Eighth Circuit in order to consider the constitutionality of the Sentencing Guidelines promulgated by the United States Sentencing Commission. The Commission is a body created under the Sentencing Reform Act of 1984 (Act), as amended, 18 U. S. C. § 3551 *et seq.* (1982 ed., Supp. IV), and 28 U. S. C. §§ 991–998 (1982 ed., Supp. IV).[1] The United States District Court for the Western District of Missouri ruled that the Guidelines

---

†*David O. Bickart* filed a brief for Joseph E. DiGenova et al. as *amici curiae* urging affirmance.

Briefs of *amici curiae* were filed for the United States Senate by *Michael Davidson, Ken U. Benjamin, Jr.,* and *Morgan J. Frankel;* and for the National Association of Criminal Defense Lawyers by *Benson B. Weintraub, Benedict P. Kuehne,* and *Dennis N. Balske.*

[1] Hereinafter, for simplicity in citation, each reference to the Act is directed to Supplement IV to the 1982 edition of the United States Code.

were constitutional. *United States* v. *Johnson*, 682 F. Supp. 1033 (1988).[2]

## I

## A

### Background

For almost a century, the Federal Government employed in criminal cases a system of indeterminate sentencing. Statutes specified the penalties for crimes but nearly always gave the sentencing judge wide discretion to decide whether the offender should be incarcerated and for how long, whether restraint, such as probation, should be imposed instead of imprisonment or fine. This indeterminate-sentencing system was supplemented by the utilization of parole, by which an offender was returned to society under the "guidance and control" of a parole officer. See *Zerbst* v. *Kidwell*, 304 U. S. 359, 363 (1938).

Both indeterminate sentencing and parole were based on concepts of the offender's possible, indeed probable, rehabilitation, a view that it was realistic to attempt to rehabilitate the inmate and thereby to minimize the risk that he would resume criminal activity upon his return to society. It obviously required the judge and the parole officer to make their respective sentencing and release decisions upon their own assessments of the offender's amenability to rehabilitation. As a result, the court and the officer were in positions to exercise, and usually did exercise, very broad discretion. See Kadish, The Advocate and the Expert — Counsel in the Peno-Correctional Process, 45 Minn. L. Rev. 803, 812–813 (1961).

---

[2] The District Court's memorandum, written by Judge Howard F. Sachs, states that his conclusion that "the Guidelines are not subject to valid challenge" by claims based on the Commission's lack of constitutional status or on a theory of unconstitutional delegation of legislative power, 682 F. Supp., at 1033–1034, is shared by District Judges Elmo B. Hunter, D. Brook Bartlett, and Dean Whipple of the Western District. *Id.*, at 1033, n. 1. Chief District Judge Scott O. Wright wrote in dissent. *Id.*, at 1035.

This led almost inevitably to the conclusion on the part of a reviewing court that the sentencing judge "sees more and senses more" than the appellate court; thus, the judge enjoyed the "superiority of his nether position," for that court's determination as to what sentence was appropriate met with virtually unconditional deference on appeal. See Rosenberg, Judicial Discretion of the Trial Court, Viewed From Above, 22 Syracuse L. Rev. 635, 663 (1971). See *Dorszynski* v. *United States*, 418 U. S. 424, 431 (1974). The decision whether to parole was also "predictive and discretionary." *Morrissey* v. *Brewer*, 408 U. S. 471, 480 (1972). The correction official possessed almost absolute discretion over the parole decision. See, *e. g.*, *Brest* v. *Ciccone*, 371 F. 2d 981, 982–983 (CA8 1967); *Rifai* v. *United States Parole Comm'n*, 586 F. 2d 695 (CA9 1978).

Historically, federal sentencing—the function of determining the scope and extent of punishment—never has been thought to be assigned by the Constitution to the exclusive jurisdiction of any one of the three Branches of Government. Congress, of course, has the power to fix the sentence for a federal crime, *United States* v. *Wiltberger*, 5 Wheat. 76 (1820), and the scope of judicial discretion with respect to a sentence is subject to congressional control. *Ex parte United States*, 242 U. S. 27 (1916). Congress early abandoned fixed-sentence rigidity, however, and put in place a system of ranges within which the sentencer could choose the precise punishment. See *United States* v. *Grayson*, 438 U. S. 41, 45–46 (1978). Congress delegated almost unfettered discretion to the sentencing judge to determine what the sentence should be within the customarily wide range so selected. This broad discretion was further enhanced by the power later granted the judge to suspend the sentence and by the resulting growth of an elaborate probation system. Also, with the advent of parole, Congress moved toward a "three-way sharing" of sentencing responsibility by granting corrections personnel in the Executive Branch the discre-

tion to release a prisoner before the expiration of the sentence imposed by the judge. Thus, under the indeterminate-sentence system, Congress defined the maximum, the judge imposed a sentence within the statutory range (which he usually could replace with probation), and the Executive Branch's parole official eventually determined the actual duration of imprisonment. See *Williams* v. *New York*, 337 U. S. 241, 248 (1949). See also *Geraghty* v. *United States Parole Comm'n*, 719 F. 2d 1199, 1211 (CA3 1983), cert. denied, 465 U. S. 1103 (1984); *United States* v. *Addonizio*, 442 U. S. 178, 190 (1979); *United States* v. *Brown*, 381 U. S. 437, 443 (1965) ("[I]f a given policy can be implemented only by a combination of legislative enactment, judicial application, and executive implementation, no man or group of men will be able to impose its unchecked will").

Serious disparities in sentences, however, were common. Rehabilitation as a sound penological theory came to be questioned and, in any event, was regarded by some as an unattainable goal for most cases. See N. Morris, The Future of Imprisonment 24–43 (1974); F. Allen, The Decline of the Rehabilitative Ideal (1981). In 1958, Congress authorized the creation of judicial sentencing institutes and joint councils, see 28 U. S. C. § 334, to formulate standards and criteria for sentencing. In 1973, the United States Parole Board adopted guidelines that established a "customary range" of confinement. See *United States Parole Comm'n* v. *Geraghty*, 445 U. S. 388, 391 (1980). Congress in 1976 endorsed this initiative through the Parole Commission and Reorganization Act, 18 U. S. C. §§ 4201–4218, an attempt to envision for the Parole Commission a role, at least in part, "to moderate the disparities in the sentencing practices of individual judges." *United States* v. *Addonizio*, 442 U. S., at 189. That Act, however, did not disturb the division of sentencing responsibility among the three Branches. The judge continued to exercise discretion and to set the sentence within the statutory range fixed by Congress, while the pris-

oner's actual release date generally was set by the Parole Commission.

This proved to be no more than a way station. Fundamental and widespread dissatisfaction with the uncertainties and the disparities continued to be expressed. Congress had wrestled with the problem for more than a decade when, in 1984, it enacted the sweeping reforms that are at issue here.

Helpful in our consideration and analysis of the statute is the Senate Report on the 1984 legislation, S. Rep. No. 98–225 (1983) (Report).[3] The Report referred to the "outmoded rehabilitation model" for federal criminal sentencing, and recognized that the efforts of the criminal justice system to achieve rehabilitation of offenders had failed. *Id.*, at 38. It observed that the indeterminate-sentencing system had two "unjustifi[ed]" and "shameful" consequences. *Id.*, at 38, 65. The first was the great variation among sentences imposed by different judges upon similarly situated offenders. The second was the uncertainty as to the time the offender would spend in prison. Each was a serious impediment to an even-handed and effective operation of the criminal justice system. The Report went on to note that parole was an inadequate device for overcoming these undesirable consequences. This was due to the division of authority between the sentencing judge and the parole officer who often worked at cross purposes; to the fact that the Parole Commission's own guidelines did not take into account factors Congress regarded as important in sentencing, such as the sophistication of the offender and the role the offender played in an offense committed with others, *id.*, at 48; and to the fact that the Parole Commission had only limited power to adjust a sentence imposed by the court. *Id.*, at 47.

---

[3] The corresponding Report in the House of Representatives was filed a year later. See H. R. Rep. No. 98–1017 (1984). The House bill (H. R. 6012, 98th Cong., 2d Sess. (1984)) eventually was set aside in favor of the Senate bill. The House Report, however, reveals that the Senate's rationale underlying sentencing reform was shared in the House.

Before settling on a mandatory-guideline system, Congress considered other competing proposals for sentencing reform. It rejected strict determinate sentencing because it concluded that a guideline system would be successful in reducing sentence disparities while retaining the flexibility needed to adjust for unanticipated factors arising in a particular case. *Id.*, at 78–79, 62. The Judiciary Committee rejected a proposal that would have made the sentencing guidelines only advisory. *Id.*, at 79.

## B

### The Act

The Act, as adopted, revises the old sentencing process in several ways:

1. It rejects imprisonment as a means of promoting rehabilitation, 28 U. S. C. § 994(k), and it states that punishment should serve retributive, educational, deterrent, and incapacitative goals, 18 U. S. C. § 3553(a)(2).

2. It consolidates the power that had been exercised by the sentencing judge and the Parole Commission to decide what punishment an offender should suffer. This is done by creating the United States Sentencing Commission, directing that Commission to devise guidelines to be used for sentencing, and prospectively abolishing the Parole Commission. 28 U. S. C. §§ 991, 994, and 995(a)(1).

3. It makes all sentences basically determinate. A prisoner is to be released at the completion of his sentence reduced only by any credit earned by good behavior while in custody. 18 U. S. C. §§ 3624(a) and (b).

4. It makes the Sentencing Commission's guidelines binding on the courts, although it preserves for the judge the discretion to depart from the guideline applicable to a particular case if the judge finds an aggravating or mitigating factor present that the Commission did not adequately consider when formulating guidelines. §§ 3553(a) and (b). The Act also requires the court to state its reasons for the sen-

tence imposed and to give "the specific reason" for imposing a sentence different from that described in the guideline. § 3553(c).

5. It authorizes limited appellate review of the sentence. It permits a defendant to appeal a sentence that is above the defined range, and it permits the Government to appeal a sentence that is below that range. It also permits either side to appeal an incorrect application of the guideline. §§ 3742(a) and (b).

Thus, guidelines were meant to establish a range of determinate sentences for categories of offenses and defendants according to various specified factors, "among others." 28 U. S. C. §§ 994(b), (c), and (d). The maximum of the range ordinarily may not exceed the minimum by more than the greater of 25% or six months, and each sentence is to be within the limit provided by existing law. §§ 994(a) and (b)(2).

## C

### The Sentencing Commission

The Commission is established "as an independent commission in the judicial branch of the United States." § 991(a). It has seven voting members (one of whom is the Chairman) appointed by the President "by and with the advice and consent of the Senate." "At least three of the members shall be Federal judges selected after considering a list of six judges recommended to the President by the Judicial Conference of the United States." *Ibid.* No more than four members of the Commission shall be members of the same political party. The Attorney General, or his designee, is an ex officio nonvoting member. The Chairman and other members of the Commission are subject to removal by the President "only for neglect of duty or malfeasance in office or for other good cause shown." *Ibid.* Except for initial staggering of terms,

a voting member serves for six years and may not serve more than two full terms. §§ 992(a) and (b).[4]

## D

## The Responsibilities of the Commission

In addition to the duty the Commission has to promulgate determinative-sentence guidelines, it is under an obligation periodically to "review and revise" the guidelines. § 994*(o)*. It is to "consult with authorities on, and individual and institutional representatives of, various aspects of the Federal criminal justice system." *Ibid.* It must report to Congress "any amendments of the guidelines." § 994(p). It is to make recommendations to Congress whether the grades or maximum penalties should be modified. § 994(r). It must submit to Congress at least annually an analysis of the operation of the guidelines. § 994(w). It is to issue "general policy statements" regarding their application. § 994(a)(2). And it has the power to "establish general policies . . . as are necessary to carry out the purposes" of the legislation, § 995(a)(1); to "monitor the performance of probation officers" with respect to the guidelines, § 995(a)(9); to "devise and conduct periodic training programs of instruction in sentencing techniques for judicial and probation personnel" and others, § 995(a)(18); and to "perform such other functions as are required to permit Federal courts to meet their responsibilities" as to sentencing, § 995(a)(22).

We note, in passing, that the monitoring function is not without its burden. Every year, with respect to each of more than 40,000 sentences, the federal courts must forward, and the Commission must review, the presentence report,

---

[4] Until the Parole Commission ceases to exist in 1992, as provided by §§ 218(a)(5) and 235(a)(1) of the Act, 98 Stat. 2027 and 2031, the Chairman of that Commission serves as an ex officio nonvoting member of the Sentencing Commission. § 235(b)(5), 98 Stat. 2033.

the guideline worksheets, the tribunal's sentencing statement, and any written plea agreement.

## II

## This Litigation

On December 10, 1987, John M. Mistretta (petitioner) and another were indicted in the United States District Court for the Western District of Missouri on three counts centering in a cocaine sale. See App. to Pet. for Cert. in No. 87–1904, p. 16a. Mistretta moved to have the promulgated Guidelines ruled unconstitutional on the grounds that the Sentencing Commission was constituted in violation of the established doctrine of separation of powers, and that Congress delegated excessive authority to the Commission to structure the Guidelines. As has been noted, the District Court was not persuaded by these contentions.[5]

The District Court rejected petitioner's delegation argument on the ground that, despite the language of the statute, the Sentencing Commission "should be judicially characterized as having Executive Branch status," 682 F. Supp., at 1035, and that the Guidelines are similar to substantive rules promulgated by other agencies. Id., at 1034–1035. The court also rejected petitioner's claim that the Act is unconstitutional because it requires Article III federal judges to serve on the Commission. Id.; at 1035. The court stated, however, that its opinion "does not imply that I have no serious doubts about some parts of the Sentencing Guidelines and the legality of their anticipated operation." Ibid.

Petitioner had pleaded guilty to the first count of his indictment (conspiracy and agreement to distribute cocaine, in violation of 21 U. S. C. §§ 846 and 841(b)(1)(B)). The Government thereupon moved to dismiss the remaining counts.

---

[5] Petitioner's claims were identical to those raised by defendants in other cases in the Western District of Missouri. Argument on petitioner's motion was presented to a panel of sentencing judges. The result is described in n. 2, supra.

That motion was granted. App. to Pet. for Cert. in No. 87–1904, p. 33a. Petitioner was sentenced under the Guidelines to 18 months' imprisonment, to be followed by a 3-year term of supervised release. *Id.*, at 30a, 35a, 37a. The court also imposed a $1,000 fine and a $50 special assessment. *Id.*, at 31a, 40a.

Petitioner filed a notice of appeal to the Eighth Circuit, but both petitioner and the United States, pursuant to this Court's Rule 18, petitioned for certiorari before judgment. Because of the "imperative public importance" of the issue, as prescribed by the Rule, and because of the disarray among the Federal District Courts,[6] we granted those petitions. 486 U. S. 1054 (1988).

## III

### Delegation of Power

Petitioner argues that in delegating the power to promulgate sentencing guidelines for every federal criminal offense to an independent Sentencing Commission, Congress has granted the Commission excessive legislative discretion in violation of the constitutionally based nondelegation doctrine. We do not agree.

The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government. The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States," U. S. Const., Art. I, § 1, and we long have insisted that "the integrity and maintenance of

---

[6] The disarray is revealed by the District Court decisions cited in the petition for certiorari in No. 87–1904, pp. 9–10, nn. 10 and 11. Since certiorari was granted, a panel of the United States Court of Appeals for the Ninth Circuit, by a divided vote, has invalidated the Guidelines on separation-of-powers grounds, *Gubiensio-Ortiz* v. *Kanahele*, 857 F. 2d 1245 (1988), cert. pending *sub nom. United States* v. *Chavez-Sanchez*, No. 88–550, and a panel of the Third Circuit (one judge, in dissent, did not reach the constitutional issue) has upheld them, *United States* v. *Frank*, 864 F. 2d 992 (1988).

the system of government ordained by the Constitution" mandate that Congress generally cannot delegate its legislative power to another Branch. *Field* v. *Clark*, 143 U. S. 649, 692 (1892). We also have recognized, however, that the separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches. In a passage now enshrined in our jurisprudence, Chief Justice Taft, writing for the Court, explained our approach to such cooperative ventures: "In determining what [Congress] may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the government co-ordination." *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394, 406 (1928). So long as Congress "shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Id.*, at 409.

Applying this "intelligible principle" test to congressional delegations, our jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives. See *Opp Cotton Mills, Inc.* v. *Administrator, Wage and Hour Div. of Dept. of Labor*, 312 U. S. 126, 145 (1941) ("In an increasingly complex society Congress obviously could not perform its functions if it were obliged to find all the facts subsidiary to the basic conclusions which support the defined legislative policy"); see also *United States* v. *Robel*, 389 U. S. 258, 274 (1967) (opinion concurring in result). "The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function." *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 421 (1935). Accordingly, this Court has deemed it "constitutionally sufficient if Congress clearly

delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *American Power & Light Co.* v. *SEC*, 329 U. S. 90, 105 (1946).

Until 1935, this Court never struck down a challenged statute on delegation grounds. See *Synar* v. *United States*, 626 F. Supp. 1374, 1383 (DC) (three-judge court), aff'd *sub nom. Bowsher* v. *Synar*, 478 U. S. 714 (1986). After invalidating in 1935 two statutes as excessive delegations, see *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495, and *Panama Refining Co.* v. *Ryan, supra*, we have upheld, again without deviation, Congress' ability to delegate power under broad standards.[7] See, *e. g., Lichter* v. *United States*, 334 U. S. 742, 785–786 (1948) (upholding delegation of authority to determine excessive profits); *American Power & Light Co.* v. *SEC*, 329 U. S., at 105 (upholding delegation of authority to Securities and Exchange Commission to prevent unfair or inequitable distribution of voting power among security holders); *Yakus* v. *United States*, 321 U. S. 414, 426 (1944) (upholding delegation to Price Administrator to fix commodity prices that would be fair and equitable, and would effectuate purposes of Emergency Price Control Act of 1942); *FPC* v. *Hope Natural Gas Co.*, 320 U. S. 591, 600 (1944) (upholding delegation to Federal Power Commission to determine

---

[7] In *Schechter* and *Panama Refining* the Court concluded that Congress had failed to articulate any policy or standard that would serve to confine the discretion of the authorities to whom Congress had delegated power. No delegation of the kind at issue in those cases is present here. The Act does not make crimes of acts never before criminalized, see *Fahey* v. *Mallonee*, 332 U. S. 245, 249 (1947) (analyzing *Panama Refining*), or delegate regulatory power to private individuals, see *Yakus* v. *United States*, 321 U. S. 414, 424 (1944) (analyzing *Schechter*). In recent years, our application of the nondelegation doctrine principally has been limited to the interpretation of statutory texts, and, more particularly, to giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional. See, *e. g., Industrial Union Dept.* v. *American Petroleum Institute*, 448 U. S. 607, 646 (1980); *National Cable Television Assn.* v. *United States*, 415 U. S. 336, 342 (1974).

just and reasonable rates); *National Broadcasting Co.* v.
*United States,* 319 U. S. 190, 225–226 (1943) (upholding dele-
gation to Federal Communications Commission to regulate
broadcast licensing "as public interest, convenience, or neces-
sity" require).

In light of our approval of these broad delegations, we har-
bor no doubt that Congress' delegation of authority to the
Sentencing Commission is sufficiently specific and detailed to
meet constitutional requirements.   Congress charged the
Commission with three goals: to "assure the meeting of the
purposes of sentencing as set forth" in the Act; to "provide
certainty and fairness in meeting the purposes of sentencing,
avoiding unwarranted sentencing disparities among defend-
ants with similar records . . . while maintaining sufficient
flexibility to permit individualized sentences," where appro-
priate; and to "reflect, to the extent practicable, advance-
ment in knowledge of human behavior as it relates to the
criminal justice process."   28 U. S. C. §991(b)(1).   Con-
gress further specified four "purposes" of sentencing that the
Commission must pursue in carrying out its mandate: "to re-
flect the seriousness of the offense, to promote respect for
the law, and to provide just punishment for the offense"; "to
afford adequate deterrence to criminal conduct"; "to protect
the public from further crimes of the defendant"; and "to pro-
vide the defendant with needed . . . correctional treatment."
18 U. S. C. §3553(a)(2).

In addition, Congress prescribed the specific tool—the
guidelines system—for the Commission to use in regulating
sentencing.   More particularly, Congress directed the Com-
mission to develop a system of "sentencing ranges" applicable
"for each category of offense involving each category of de-
fendant."   28 U. S. C. §994(b).[8]   Congress instructed the

---

[8] Congress mandated that the guidelines include:

"(A) a determination whether to impose a sentence to probation, a fine,
or a term of imprisonment;

Commission that these sentencing ranges must be consistent with pertinent provisions of Title 18 of the United States Code and could not include sentences in excess of the statutory maxima. Congress also required that for sentences of imprisonment, "the maximum of the range established for such a term shall not exceed the minimum of that range by more than the greater of 25 percent or 6 months, except that, if the minimum term of the range is 30 years or more, the maximum may be life imprisonment." § 994(b)(2). Moreover, Congress directed the Commission to use current average sentences "as a starting point" for its structuring of the sentencing ranges. § 994(m).

To guide the Commission in its formulation of offense categories, Congress directed it to consider seven factors: the grade of the offense; the aggravating and mitigating circumstances of the crime; the nature and degree of the harm caused by the crime; the community view of the gravity of the offense; the public concern generated by the crime; the deterrent effect that a particular sentence may have on others; and the current incidence of the offense. §§ 994(c)(1)–(7).[9] Congress set forth 11 factors for the Commission to

"(B) a determination as to the appropriate amount of a fine or the appropriate length of a term of probation or a term of imprisonment;

"(C) a determination whether a sentence to a term of imprisonment should include a requirement that the defendant be placed on a term of supervised release after imprisonment, and, if so, the appropriate length of such a term; and

"(D) a determination whether multiple sentences to terms of imprisonment should be ordered to run concurrently or consecutively." 28 U. S. C. § 994(a)(1).

[9] The Senate Report on the legislation elaborated on the purpose to be served by each factor. The Report noted, for example, that the reference to the community view of the gravity of an offense was "not intended to mean that a sentence might be enhanced because of public outcry about a single offense," but "to suggest that changed community norms concerning certain particular criminal behavior might be justification for increasing or decreasing the recommended penalties for the offense." Report, at 170. The Report, moreover, gave spe-

consider in establishing categories of defendants. These include the offender's age, education, vocational skills, mental and emotional condition, physical condition (including drug dependence), previous employment record, family ties and responsibilities, community ties, role in the offense, criminal history, and degree of dependence upon crime for a livelihood. § 994(d)(1)–(11).[10] Congress also prohibited the Commission from considering the "race, sex, national origin, creed, and socioeconomic status of offenders," § 994(d), and instructed that the guidelines should reflect the "general inappropriateness" of considering certain other factors, such as current unemployment, that might serve as proxies for forbidden factors, § 994(e).

In addition to these overarching constraints, Congress provided even more detailed guidance to the Commission about categories of offenses and offender characteristics. Congress directed that guidelines require a term of confinement at or near the statutory maximum for certain crimes of violence and for drug offenses, particularly when committed by recidivists. § 994(h). Congress further directed that the Commission assure a substantial term of imprisonment for an offense constituting a third felony conviction, for a career

---

cific examples of areas in which prevailing sentences might be too lenient, including the treatment of major white-collar criminals. *Id.*, at 177.

[10] Again, the legislative history provides additional guidance for the Commission's consideration of the statutory factors. For example, the history indicates Congress' intent that the "criminal history . . . factor includes not only the number of prior criminal acts — whether or not they resulted in convictions — the defendant has engaged in, but their seriousness, their recentness or remoteness, and their indication whether the defendant is a 'career criminal' or a manager of a criminal enterprise." *Id.*, at 174. This legislative history, together with Congress' directive that the Commission begin its consideration of the sentencing ranges by ascertaining the average sentence imposed in each category in the past, and Congress' explicit requirement that the Commission consult with authorities in the field of criminal sentencing provide a factual background and statutory context that give content to the mandate of the Commission. See *American Power & Light Co.* v. *SEC*, 329 U. S. 90, 104–105 (1946).

felon, for one convicted of a managerial role in a racketeering enterprise, for a crime of violence by an offender on release from a prior felony conviction, and for an offense involving a substantial quantity of narcotics. § 994(i). Congress also instructed "that the guidelines reflect . . . the general appropriateness of imposing a term of imprisonment" for a crime of violence that resulted in serious bodily injury. On the other hand, Congress directed that guidelines reflect the general inappropriateness of imposing a sentence of imprisonment "in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." § 994(j). Congress also enumerated various aggravating and mitigating circumstances, such as, respectively, multiple offenses or substantial assistance to the Government, to be reflected in the guidelines. §§ 994(l) and (n). In other words, although Congress granted the Commission substantial discretion in formulating guidelines, in actuality it legislated a full hierarchy of punishment—from near maximum imprisonment, to substantial imprisonment, to some imprisonment, to alternatives—and stipulated the most important offense and offender characteristics to place defendants within these categories.

We cannot dispute petitioner's contention that the Commission enjoys significant discretion in formulating guidelines. The Commission does have discretionary authority to determine the relative severity of federal crimes and to assess the relative weight of the offender characteristics that Congress listed for the Commission to consider. See §§ 994(c) and (d) (Commission instructed to consider enumerated factors as it deems them to be relevant). The Commission also has significant discretion to determine which crimes have been punished too leniently, and which too severely. § 994(m). Congress has called upon the Commission to exercise its judgment about which types of crimes and which

types of criminals are to be considered similar for the purposes of sentencing.[11]

But our cases do not at all suggest that delegations of this type may not carry with them the need to exercise judgment on matters of policy. In *Yakus* v. *United States*, 321 U. S. 414 (1944), the Court upheld a delegation to the Price Administrator to fix commodity prices that "in his judgment will be generally fair and equitable and will effectuate the purposes of this Act" to stabilize prices and avert speculation. See *id.*, at 420. In *National Broadcasting Co.* v. *United States*, 319 U. S. 190 (1943), we upheld a delegation to the Federal Communications Commission granting it the authority to promulgate regulations in accordance with its view of the "public interest." In *Yakus*, the Court laid down the applicable principle:

> "It is no objection that the determination of facts and the inferences to be drawn from them in the light of the statutory standards and declaration of policy call for the ex-

[11] Petitioner argues that the excessive breadth of Congress' delegation to the Commission is particularly apparent in the Commission's considering whether to "reinstate" the death penalty for some or all of those crimes for which capital punishment is still authorized in the Federal Criminal Code. See Brief for Petitioner 51–52. Whether, in fact, the Act confers upon the Commission the power to develop guidelines and procedures to bring current death penalty provisions into line with decisions of this Court is a matter of intense debate between the Executive Branch and some members of Congress, including the Chairman of the Senate Judiciary Committee. See *Gubiensio-Ortiz* v. *Kanahele*, 857 F. 2d, at 1256. We assume, without deciding, that the Commission was assigned the power to effectuate the death penalty provisions of the Criminal Code. That the Commission may have this authority (but has not exercised it) does not affect our analysis. Congress did not authorize the Commission to enact a federal death penalty for any offense. As for every other offense within the Commission's jurisdiction, the Commission could include the death penalty within the guidelines only if that punishment was authorized in the first instance by Congress and only if such inclusion comported with the substantial guidance Congress gave the Commission in fulfilling its assignments. JUSTICE BRENNAN does not join this footnote.

ercise of judgment, and for the formulation of subsidiary administrative policy within the prescribed statutory framework. . . .

". . . Only if we could say that there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed, would we be justified in overriding its choice of means for effecting its declared purpose . . . ." 321 U. S., at 425–426.

Congress has met that standard here. The Act sets forth more than merely an "intelligible principle" or minimal standards. One court has aptly put it: "The statute outlines the policies which prompted establishment of the Commission, explains what the Commission should do and how it should do it, and sets out specific directives to govern particular situations." *United States* v. *Chambless,* 680 F. Supp. 793, 796 (ED La. 1988).

Developing proportionate penalties for hundreds of different crimes by a virtually limitless array of offenders is precisely the sort of intricate, labor-intensive task for which delegation to an expert body is especially appropriate. Although Congress has delegated significant discretion to the Commission to draw judgments from its analysis of existing sentencing practice and alternative sentencing models, "Congress is not confined to that method of executing its policy which involves the least possible delegation of discretion to administrative officers." *Yakus* v. *United States,* 321 U. S., at 425–426. We have no doubt that in the hands of the Commission "the criteria which Congress has supplied are wholly adequate for carrying out the general policy and purpose" of the Act. *Sunshine Coal Co.* v. *Adkins,* 310 U. S. 381, 398 (1940).

IV

Separation of Powers

Having determined that Congress has set forth sufficient standards for the exercise of the Commission's delegated authority, we turn to Mistretta's claim that the Act violates the constitutional principle of separation of powers.

This Court consistently has given voice to, and has reaffirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty. See, *e. g.*, *Morrison* v. *Olson*, 487 U. S. 654, 685–696 (1988); *Bowsher* v. *Synar*, 478 U. S., at 725. Madison, in writing about the principle of separated powers, said: "No political truth is certainly of greater intrinsic value or is stamped with the authority of more enlightened patrons of liberty." The Federalist No. 47, p. 324 (J. Cooke ed. 1961).

In applying the principle of separated powers in our jurisprudence, we have sought to give life to Madison's view of the appropriate relationship among the three coequal Branches. Accordingly, we have recognized, as Madison admonished at the founding, that while our Constitution mandates that "each of the three general departments of government [must remain] entirely free from the control or coercive influence, direct or indirect, of either of the others," *Humphrey's Executor* v. *United States*, 295 U. S. 602, 629 (1935), the Framers did not require—and indeed rejected—the notion that the three Branches must be entirely separate and distinct. See, *e. g.*, *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 443 (1977) (rejecting as archaic complete division of authority among the three Branches); *United States* v. *Nixon*, 418 U. S. 683 (1974) (affirming Madison's flexible approach to separation of powers). Madison, defending the Constitution against charges that it established insufficiently separate Branches, addressed the point directly. Separation of powers, he wrote, "d[oes] not mean that these [three]

departments ought to have no *partial agency* in, or no *controul* over the acts of each other," but rather "that where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution, are subverted." The Federalist No. 47, pp. 325–326 (J. Cooke ed. 1961) (emphasis in original). See *Nixon* v. *Administrator of General Services*, 433 U. S., at 442, n. 5. Madison recognized that our constitutional system imposes upon the Branches a degree of overlapping responsibility, a duty of interdependence as well as independence the absence of which "would preclude the establishment of a Nation capable of governing itself effectively." *Buckley* v. *Valeo*, 424 U. S. 1, 121 (1976). In a passage now commonplace in our cases, Justice Jackson summarized the pragmatic, flexible view of differentiated governmental power to which we are heir:

> "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 635 (1952) (concurring opinion).

In adopting this flexible understanding of separation of powers, we simply have recognized Madison's teaching that the greatest security against tyranny—the accumulation of excessive authority in a single Branch—lies not in a hermetic division among the Branches, but in a carefully crafted system of checked and balanced power within each Branch. "[T]he greatest security," wrote Madison, "against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department, the necessary constitutional means, and personal motives, to resist encroachments of the others." The Federalist No. 51, p. 349 (J. Cooke ed. 1961). Accordingly, as we have noted

many times, the Framers "built into the tripartite Federal Government . . . a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Buckley* v. *Valeo*, 424 U. S., at 122. See also *INS* v. *Chadha*, 462 U. S. 919, 951 (1983).

It is this concern of encroachment and aggrandizement that has animated our separation-of-powers jurisprudence and aroused our vigilance against the "hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power." *Ibid.* · Accordingly, we have not hesitated to strike down provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch. For example, just as the Framers recognized the· particular danger of the Legislative Branch's accreting to itself judicial or executive power,[12] so too have we invalidated attempts by Congress to exercise the responsibilities of other Branches or to reassign powers vested by the Constitution in either the Judicial Branch or the Executive Branch. *Bowsher* v. *Synar*, 478 U. S. 714 (1986) (Congress may not exercise removal power over officer performing executive functions); *INS* v. *Chadha, supra* (Congress may not control execution of laws except through Art. I procedures); *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50 (1982) (Congress may not confer Art. III power on Art. I judge). By the same token, we have upheld statutory provisions that to some degree commingle the functions of the Branches, but that pose no danger of either aggrandizement or encroachment. *Morrison* v. *Olson*, 487 U. S. 654 (1988) (upholding judicial appointment of independent counsel); *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833 (1986) (up-

---

[12] Madison admonished: "In republican government the legislative authority, necessarily, predominates." The Federalist No. 51, p. 350 (J. Cooke ed. 1961).

holding agency's assumption of jurisdiction over state-law counterclaims).

In *Nixon* v. *Administrator of General Services, supra,* upholding, against a separation-of-powers challenge, legislation providing for the General Services Administration to control Presidential papers after resignation, we described our separation-of-powers inquiry as focusing "on the extent to which [a provision of law] prevents the Executive Branch from accomplishing its constitutionally assigned functions." 433 U. S., at 443 (citing *United States* v. *Nixon,* 418 U. S., at 711–712.[13]  In cases specifically involving the Judicial Branch, we have expressed our vigilance against two dangers: first, that the Judicial Branch neither be assigned nor allowed "tasks that are more properly accomplished by [other] branches," *Morrison* v. *Olson,* 487 U. S., at 680–681, and, second, that no provision of law "impermissibly threatens the institutional integrity of the Judicial Branch." *Commodity Futures Trading Comm'n* v. *Schor,* 478 U. S., at 851.

Mistretta argues that the Act suffers from each of these constitutional infirmities.   He argues that Congress, in constituting the Commission as it did, effected an unconstitutional accumulation of power within the Judicial Branch while at the same time undermining the Judiciary's independence and integrity.   Specifically, petitioner claims that in delegating to an independent agency within the Judicial Branch the power to promulgate sentencing guidelines, Congress unconstitutionally has required the Branch, and individual Article III judges, to exercise not only their judicial authority, but legislative authority—the making of sentencing policy—as well.   Such rulemaking authority, petitioner contends, may be exercised by Congress, or delegated by Congress to the

---

[13] If the potential for disruption is present, we then determine "whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Nixon* v. *Administrator of General Services,* 433 U. S., at 443.

Executive, but may not be delegated to or exercised by the Judiciary.   Brief for Petitioner 21.

At the same time, petitioner asserts, Congress unconstitutionally eroded the integrity and independence of the Judiciary by requiring Article III judges to sit on the Commission, by requiring that those judges share their rulemaking authority with nonjudges, and by subjecting the Commission's members to appointment and removal by the President.   According to petitioner, Congress, consistent with the separation of powers, may not upset the balance among the Branches by co-opting federal judges into the quintessentially political work of establishing sentencing guidelines, by subjecting those judges to the political whims of the Chief Executive, and by forcing judges to share their power with nonjudges.   *Id.*, at 15–35.

"When this Court is asked to invalidate a statutory provision that has been approved by both Houses of the Congress and signed by the President, particularly an Act of Congress that confronts a deeply vexing national problem, it should only do so for the most compelling constitutional reasons." *Bowsher* v. *Synar*, 478 U. S., at 736 (opinion concurring in judgment).   Although the unique composition and responsibilities of the Sentencing Commission give rise to serious concerns about a disruption of the appropriate balance of governmental power among the coordinate Branches, we conclude, upon close inspection, that petitioner's fears for the fundamental structural protections of the Constitution prove, at least in this case, to be "more smoke than fire," and do not compel us to invalidate Congress' considered scheme for resolving the seemingly intractable dilemma of excessive disparity in criminal sentencing.

## A

### Location of the Commission

The Sentencing Commission unquestionably is a peculiar institution within the framework of our Government.   Although placed by the Act in the Judicial Branch, it is not a

court and does not exercise judicial power. Rather, the Commission is an "independent" body comprised of seven voting members including at least three federal judges, entrusted by Congress with the primary task of promulgating sentencing guidelines. 28 U. S. C. § 991(a). Our constitutional principles of separated powers are not violated, however, by mere anomaly or innovation. Setting to one side, for the moment, the question whether the composition of the Sentencing Commission violates the separation of powers, we observe that Congress' decision to create an independent rulemaking body to promulgate sentencing guidelines and to locate that body within the Judicial Branch is not unconstitutional unless Congress has vested in the Commission powers that are more appropriately performed by the other Branches or that undermine the integrity of the Judiciary.

According to express provision of Article III, the judicial power of the United States is limited to "Cases" and "Controversies." See *Muskrat* v. *United States*, 219 U. S. 346, 356 (1911). In implementing this limited grant of power, we have refused to issue advisory opinions or to resolve disputes that are not justiciable. See, *e. g.*, *Flast* v. *Cohen*, 392 U. S. 83 (1968); *United States* v. *Ferreira*, 13 How. 40 (1852). These doctrines help to ensure the independence of the Judicial Branch by precluding debilitating entanglements between the Judiciary and the two political Branches, and prevent the Judiciary from encroaching into areas reserved for the other Branches by extending judicial power to matters beyond those disputes "traditionally thought to be capable of resolution through the judicial process." *Flast* v. *Cohen*, 392 U. S., at 97; see also *United States Parole Comm'n* v. *Geraghty*, 445 U. S., at 396. As a general principle, we stated as recently as last Term that "'executive or administrative duties of a nonjudicial nature may not be imposed on judges holding office under Art. III of the Constitution.'" *Morrison* v. *Olson*, 487 U. S., at 677, quoting *Buckley* v. *Valeo*, 424 U. S., at 123, citing in turn *United States* v. *Ferreira*, *supra*, and *Hayburn's Case*, 2 Dall. 409 (1792).

Nonetheless, we have recognized significant exceptions to this general rule and have approved the assumption of some nonadjudicatory activities by the Judicial Branch. In keeping with Justice Jackson's *Youngstown* admonition that the separation of powers contemplates the integration of dispersed powers into a workable Government, we have recognized the constitutionality of a "twilight area" in which the activities of the separate Branches merge. In his dissent in *Myers* v. *United States*, 272 U. S. 52 (1926), Justice Brandeis explained that the separation of powers "left to each [Branch] power to exercise, in some respects, functions in their nature executive, legislative and judicial." *Id.*, at 291.

That judicial rulemaking, at least with respect to some subjects, falls within this twilight area is no longer an issue for dispute. None of our cases indicate that rulemaking *per se* is a function that may not be performed by an entity within the Judicial Branch, either because rulemaking is inherently nonjudicial or because it is a function exclusively committed to the Executive Branch.[14] On the contrary, we specifically

---

[14] Our recent cases cast no doubt on the continuing vitality of the view that rulemaking is not a function exclusively committed to the Executive Branch. Although in *INS* v. *Chadha*, 462 U. S. 919 (1983), we characterized rulemaking as "Executive action" not governed by the Presentment Clauses, we did so as part of our effort to distinguish the rulemaking of administrative agencies from "lawmaking" by Congress which is subject to the presentment requirements of Article I. *Id.*, at 953, n. 16. Plainly, this reference to rulemaking as an executive function was not intended to undermine our recognition in previous cases and in over 150 years of practice that rulemaking pursuant to a legislative delegation is not the exclusive prerogative of the Executive. See, *e. g.*, *Buckley* v. *Valeo*, 424 U. S. 1, 138 (1976) (distinguishing between Federal Election Commission's exclusively executive enforcement power and its other powers, including rulemaking); see also *Humphrey's Executor* v. *United States*, 295 U. S. 602, 617 (1935). On the contrary, rulemaking power originates in the Legislative Branch and becomes an executive function only when delegated by the Legislature to the Executive Branch.

More generally, it hardly can be argued in this case that Congress has impaired the functioning of the Executive Branch. In the field of sentenc-

have held that Congress, in some circumstances, may confer rulemaking authority on the Judicial Branch. In *Sibbach* v. *Wilson & Co.*, 312 U. S. 1 (1941), we upheld a challenge to certain rules promulgated under the Rules Enabling Act of 1934, which conferred upon the Judiciary the power to promulgate federal rules of civil procedure. See 28 U. S. C. § 2072. We observed: "Congress has undoubted power to regulate the practice and procedure of federal courts, and may exercise that power by delegating to this or other federal courts authority to make rules not inconsistent with the statutes or constitution of the United States." 312 U. S., at 9–10 (footnote omitted). This passage in *Sibbach* simply echoed what had been our view since *Wayman* v. *Southard*, 10 Wheat. 1, 43 (1825), decided more than a century earlier, where Chief Justice Marshall wrote for the Court that rulemaking power pertaining to the Judicial Branch may be "conferred on the judicial department." Discussing this delegation of rulemaking power, the Court found Congress authorized

> "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this constitution in the government of the United States, or in any department or officer thereof. The judicial department is invested with jurisdiction in certain specified cases, in all which it has power to render judgment.

---

ing, the Executive Branch never has exercised the kind of authority that Congress has vested in the Commission. Moreover, since Congress has empowered the President to appoint and remove Commission members, the President's relationship to the Commission is functionally no different from what it would have been had Congress not located the Commission in the Judicial Branch. Indeed, since the Act grants ex officio membership on the Commission to the Attorney General or his designee, 28 U. S. C. § 991(a), the Executive Branch's involvement in the Commission is greater than in other independent agencies, such as the Securities and Exchange Commission, not located in the Judicial Branch.

> "That a power to make laws for carrying into execution all the judgments which the judicial department has power to pronounce, is expressly conferred by this clause, seems to be one of those plain propositions which reasoning cannot render plainer." *Id.*, at 22.

See also *Hanna* v. *Plumer*, 380 U. S. 460 (1965). Pursuant to this power to delegate rulemaking authority to the Judicial Branch, Congress expressly has authorized this Court to establish rules for the conduct of its own business and to prescribe rules of procedure for lower federal courts in bankruptcy cases, in other civil cases, and in criminal cases, and to revise the Federal Rules of Evidence. See generally J. Weinstein, Reform of Court Rule-Making Procedures (1977). Our approach to other nonadjudicatory activities that Congress has vested either in federal courts or in auxiliary bodies within the Judicial Branch has been identical to our approach to judicial rulemaking: consistent with the separation of powers, Congress may delegate to the Judicial Branch nonadjudicatory functions that do not trench upon the prerogatives of another Branch and that are appropriate to the central mission of the Judiciary. Following this approach, we specifically have upheld not only Congress' power to confer on the Judicial Branch the rulemaking authority contemplated in the various enabling Acts, but also to vest in judicial councils authority to "make 'all necessary orders for the effective and expeditious administration of the business of the courts.'" *Chandler* v. *Judicial Council*, 398 U. S. 74, 86, n. 7 (1970), quoting 28 U. S. C. § 332 (1970 ed.). Though not the subject of constitutional challenge, by established practice we have recognized Congress' power to create the Judicial Conference of the United States, the Rules Advisory Committees that it oversees, and the Administrative Office of the United States Courts whose myriad responsibilities

include the administration of the entire probation service.[15] These entities, some of which are comprised of judges, others of judges and nonjudges, still others of nonjudges only, do not exercise judicial power in the constitutional sense of deciding cases and controversies, but they share the common purpose of providing for the fair and efficient fulfillment of responsibilities that are properly the province of the Judiciary. Thus, although the judicial power of the United States is limited by express provision of Article III to "Cases" and "Controversies," we have never held, and have clearly disavowed in practice, that the Constitution prohibits Congress from assigning to courts or auxiliary bodies within the Judicial Branch administrative or rulemaking duties that, in the words of Chief Justice Marshall, are "necessary and proper . . . for carrying into execution all the judgments which the judicial department has power to pronounce." *Wayman* v. *Southard*, 10 Wheat., at 22.[16] Because of their

---

[15] The Judicial Conference of the United States is charged with "promot[ing] uniformity of management procedures and the expeditious conduct of court business," in part by "a continuous study of the operation and effect of the general rules of practice and procedure," and recommending changes "to promote simplicity in procedure, fairness in administration, the just determination of litigation, and the elimination of unjustifiable expense and delay." 28 U. S. C. § 331 (1982 ed. and Supp. IV). Similarly, the Administrative Office of the United States Courts handles the administrative and personnel matters of the courts, matters essential to the effective and efficient operation of the judicial system. § 604 (1982 ed. and Supp. IV). Congress also has established the Federal Judicial Center which studies improvements in judicial administration. §§ 620–628 (1982 ed. and Supp. IV).

[16] We also have upheld Congress' power under the Appointments Clause to vest appointment power in the Judicial Branch, concluding that the power of appointment, though not judicial, was not "inconsistent as a functional matter with the courts' exercise of their Article III powers." *Morrison* v. *Olson*, 487 U. S. 654, 679, n. 16 (1988). See also *Ex parte Siebold*, 100 U. S. 371 (1880) (appointment power not incongruous to Judiciary). In *Morrison*, we noted that Article III courts perform a variety of functions not necessarily or directly connected to adversarial proceedings

close relation to the central mission of the Judicial Branch, such extrajudicial activities are consonant with the integrity of the Branch and are not more appropriate for another Branch.

In light of this precedent and practice, we can discern no separation-of-powers impediment to the placement of the Sentencing Commission within the Judicial Branch. As we described at the outset, the sentencing function long has been a peculiarly shared responsibility among the Branches of Government and has never been thought of as the exclusive constitutional province of any one Branch. See, *e. g.*, *United States* v. *Addonizio,* 442 U. S., at 188–189. For more than a century, federal judges have enjoyed wide discretion to determine the appropriate sentence in individual cases and have exercised special authority to determine the sentencing factors to be applied in any given case. Indeed, the legislative history of the Act makes clear that Congress' decision to place the Commission within the Judicial Branch reflected Congress' "strong feeling" that sentencing has been and should remain "primarily a judicial function." Report, at 159. That Congress should vest such rulemaking in the Judicial Branch, far from being "incongruous" or vesting within the Judiciary responsibilities that more appropriately belong to another Branch, simply acknowledges the role that

---

in a trial or appellate court. Federal courts supervise grand juries and compel the testimony of witnesses before those juries, see *Brown* v. *United States,* 359 U. S. 41, 49 (1959), participate in the issuance of search warrants, see Fed. Rule Crim. Proc. 41, and review wiretap applications, see 18 U. S. C. §§ 2516, 2518 (1982 ed. and Supp. IV). In the interest of effectuating their judgments, federal courts also possess inherent authority to initiate a contempt proceeding and to appoint a private attorney to prosecute the contempt. *Young* v. *United States ex rel. Vuitton et Fils S. A.,* 481 U. S. 787 (1987). See also *In re Certain Complaints Under Investigation,* 783 F. 2d 1488, 1505 (CA11) (upholding statute authorizing judicial council to investigate improper conduct by federal judge), cert. denied *sub nom. Hastings* v. *Godbold,* 477 U. S. 904 (1986).

the Judiciary always has played, and continues to play, in sentencing.[17]

Given the consistent responsibility of federal judges to pronounce sentence within the statutory range established by Congress, we find that the role of the Commission in promulgating guidelines for the exercise of that judicial function bears considerable similarity to the role of this Court in establishing rules of procedure under the various enabling Acts. Such guidelines, like the Federal Rules of Criminal and Civil Procedure, are court rules—rules, to paraphrase Chief Justice Marshall's language in *Wayman*, for carrying into execution judgments that the Judiciary has the power to pronounce. Just as the rules of procedure bind judges and courts in the proper management of the cases before them, so the Guidelines bind judges and courts in the exercise of their uncontested responsibility to pass sentence in criminal cases. In other words, the Commission's functions, like this Court's function in promulgating procedural rules, are clearly attendant to a central element of the historically acknowledged mission of the Judicial Branch.

Petitioner nonetheless objects that the analogy between the Guidelines and the rules of procedure is flawed: Although the Judicial Branch may participate in rulemaking and administrative work that is "procedural" in nature, it may not assume, it is said, the "substantive" authority over sentencing

---

[17] Indeed, had Congress decided to confer responsibility for promulgating sentencing guidelines on the Executive Branch, we might face the constitutional questions whether Congress unconstitutionally had assigned judicial responsibilities to the Executive or unconstitutionally had united the power to prosecute and the power to sentence within one Branch. Ronald L. Gainer, Acting Deputy Assistant Attorney General, Department of Justice, testified before the Senate to this very effect: "If guidelines were to be promulgated by an agency outside the judicial branch, it might be viewed as an encroachment on a judicial function . . . ." Reform of the Federal Criminal Laws, Hearing on S. 1437 et al. before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 95th Cong., 1st Sess., pt. 13, p. 9005 (1977).

policy that Congress has delegated to the Commission. Such substantive decisionmaking, petitioner contends, entangles the Judicial Branch in essentially political work of the other Branches and unites both judicial and legislative power in the Judicial Branch.

We agree with petitioner that the nature of the Commission's rulemaking power is not strictly analogous to this Court's rulemaking power under the enabling Acts. Although we are loath to enter the logical morass of distinguishing between substantive and procedural rules, see *Sun Oil Co.* v. *Wortman*, 486 U. S. 717 (1988) (distinction between substance and procedure depends on context), and although we have recognized that the Federal Rules of Civil Procedure regulate matters "falling within the uncertain area between substance and procedure, [and] are rationally capable of classification as either," *Hanna* v. *Plumer*, 380 U. S., at 472, we recognize that the task of promulgating rules regulating practice and pleading before federal courts does not involve the degree of political judgment integral to the Commission's formulation of sentencing guidelines.[18] To be sure, all rulemaking is nonjudicial in the sense that rules impose standards of general application divorced from the individual fact situation which ordinarily forms the predicate for judicial action. Also, this Court's rulemaking under the enabling Acts has been substantive and political in the sense that the rules of procedure have important effects on the substantive rights of litigants.[19] Nonetheless, the degree of

---

[18] Under its mandate, the Commission must make judgments about the relative importance of such considerations as the "circumstances under which the offense was committed," the "community view of the gravity of the offense," and the "deterrent effect a particular sentence may have on the commission of the offense by others." 28 U. S. C. §§ 994(c)(2), (4), (6).

[19] Rule 23 of the Federal Rules of Civil Procedure, for example, has inspired a controversy over the philosophical, social, and economic merits and demerits of class actions. See Miller, Of Frankenstein Monsters and Shining Knights: Myth, Reality, and the "Class Action Problem," 92 Harv. L. Rev. 664 (1979).

political judgment about crime and criminality exercised by the Commission and the scope of the substantive effects of its work does to some extent set its rulemaking powers apart from prior judicial rulemaking. Cf. *Miller* v. *Florida*, 482 U. S. 423 (1987) (state sentencing guidelines not procedural).

We do not believe, however, that the significantly political nature of the Commission's work renders unconstitutional its placement within the Judicial Branch. Our separation-of-powers analysis does not turn on the labeling of an activity as "substantive" as opposed to "procedural," or "political" as opposed to "judicial." See *Bowsher* v. *Synar*, 478 U. S., at 749 ("[G]overnmental power cannot always be readily characterized with only one . . . labe[l]") (opinion concurring in judgment). Rather, our inquiry is focused on the "unique aspects of the congressional plan at issue and its practical consequences in light of the larger concerns that underlie Article III." *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S., at 857. In this case, the "practical consequences" of locating the Commission within the Judicial Branch pose no threat of undermining the integrity of the Judicial Branch or of expanding the powers of the Judiciary beyond constitutional bounds by uniting within the Branch the political or quasi-legislative power of the Commission with the judicial power of the courts.

First, although the Commission is located in the Judicial Branch, its powers are not united with the powers of the Judiciary in a way that has meaning for separation-of-powers analysis. Whatever constitutional problems might arise if the powers of the Commission were vested in a court, the Commission is not a court, does not exercise judicial power, and is not controlled by or accountable to members of the Judicial Branch. The Commission, on which members of the Judiciary may be a minority, is an independent agency in every relevant sense. In contrast to a court's exercising judicial power, the Commission is fully accountable to Congress, which can revoke or amend any or all of the Guidelines

as it sees fit either within the 180-day waiting period, see § 235(a)(1)(B)(ii)(III) of the Act, 98 Stat. 2032, or at any time. In contrast to a court, the Commission's members are subject to the President's limited powers of removal. In contrast to a court, its rulemaking is subject to the notice and comment requirements of the Administrative Procedure Act, 28 U. S. C. § 994(x). While we recognize the continuing vitality of Montesquieu's admonition: "'Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary controul,'" The Federalist No. 47, p. 326 (J. Cooke ed. 1961) (Madison), quoting Montesquieu, because Congress vested the power to promulgate sentencing guidelines in an independent agency, not a court, there can be no serious argument that Congress combined legislative and judicial power within the Judicial Branch.[20]

---

[20] We express no opinion about whether, under the principles of separation of powers, Congress may confer on a court rulemaking authority such as that exercised by the Sentencing Commission. Our precedents and customs draw no clear distinction between nonadjudicatory activity that may be undertaken by auxiliary bodies within the Judicial Branch, but not by courts. We note, however, that the constitutional calculus is different for considering nonadjudicatory activities performed by bodies that exercise judicial power and enjoy the constitutionally mandated autonomy of courts from what it is for considering the nonadjudicatory activities of independent nonadjudicatory agencies that Congress merely has located within the Judicial Branch pursuant to its powers under the Necessary and Proper Clause. We make no attempt here to define the nonadjudicatory duties that are appropriate for auxiliary bodies within the Judicial Branch, but not for courts. Nonetheless, it is clear to us that an independent agency located within the Judicial Branch may undertake without constitutional consequences policy judgments pursuant to a legitimate congressional delegation of authority that, if undertaken by a court, might be incongruous to or destructive of the central adjudicatory mission of the Branch. See *United States* v. *Ferreira*, 13 How. 40 (1852). In this sense, the issue we face here is different from the issue we faced in *Morrison* v. *Olson*, 487 U. S. 654 (1988), where we considered the constitutionality of the nonadjudicatory functions assigned to the "Special Division" court created by the Ethics in Government Act of 1978, 28 U. S. C. §§ 49, 591 *et seq.* (1982 ed. and Supp. IV), or the issue we faced in *Hayburn's Case*, 2 Dall. 409

Second, although the Commission wields rulemaking power and not the adjudicatory power exercised by individual judges when passing sentence, the placement of the Sentencing Commission in the Judicial Branch has not increased the Branch's authority. Prior to the passage of the Act, the Judicial Branch, as an aggregate, decided precisely the questions assigned to the Commission: what sentence is appropriate to what criminal conduct under what circumstances. It was the everyday business of judges, taken collectively, to evaluate and weigh the various aims of sentencing and to apply those aims to the individual cases that came before them. The Sentencing Commission does no more than this, albeit basically through the methodology of sentencing guidelines, rather than entirely individualized sentencing determinations. Accordingly, in placing the Commission in the Judicial Branch, Congress cannot be said to have aggrandized the authority of that Branch or to have deprived the Executive Branch of a power it once possessed. Indeed, because the Guidelines have the effect of promoting sentencing within a narrower range than was previously applied, the power of the Judicial Branch is, if anything, somewhat diminished by the Act. And, since Congress did not unconstitutionally delegate its own authority, the Act does not unconstitutionally diminish Congress' authority. Thus, although Congress has authorized the Commission to exercise a greater degree of political judgment than has been exercised in the past by any one entity within the Judicial Branch, in the unique context of sentencing, this authorization does nothing to upset the balance of power among the Branches.

What Mistretta's argument comes down to, then, is not that the substantive responsibilities of the Commission aggrandize the Judicial Branch, but that that Branch is inevitably weakened by its participation in policymaking. We do not believe, however, that the placement within the Judicial

---

(1792), and in *Ferreira*, in which Article III courts were asked to render judgments that were reviewable by an executive officer.

Branch of an independent agency charged with the promulgation of sentencing guidelines can possibly be construed as preventing the Judicial Branch "from accomplishing its constitutionally assigned functions." *Nixon* v. *Administrator of General Services*, 433 U. S., at 443. Despite the substantive nature of its work, the Commission is not incongruous or inappropriate to the Branch. As already noted, sentencing is a field in which the Judicial Branch long has exercised substantive or political judgment. What we said in *Morrison* when upholding the power of the Special Division to appoint independent counsel applies with even greater force here: "This is not a case in which judges are given power . . . in an area in which they have no special knowledge or expertise." 487 U. S., at 676, n. 13. On the contrary, Congress placed the Commission in the Judicial Branch precisely because of the Judiciary's special knowledge and expertise.

Nor do the Guidelines, though substantive, involve a degree of political authority inappropriate for a nonpolitical Branch. Although the Guidelines are intended to have substantive effects on public behavior (as do the rules of procedure), they do not bind or regulate the primary conduct of the public or vest in the Judicial Branch the legislative responsibility for establishing minimum and maximum penalties for every crime. They do no more than fetter the discretion of sentencing judges to do what they have done for generations —impose sentences within the broad limits established by Congress. Given their limited reach, the special role of the Judicial Branch in the field of sentencing, and the fact that the Guidelines are promulgated by an independent agency and not a court, it follows that as a matter of "practical consequences" the location of the Sentencing Commission within the Judicial Branch simply leaves with the Judiciary what long has belonged to it.

In sum, since substantive judgment in the field of sentencing has been and remains appropriate to the Judicial Branch, and the methodology of rulemaking has been and remains ap-

propriate to that Branch, Congress' considered decision to combine these functions in an independent Sentencing Commission and to locate that Commission within the Judicial Branch does not violate the principle of separation of powers.

## B

### Composition of the Commission

We now turn to petitioner's claim that Congress' decision to require at least three federal judges to serve on the Commission and to require those judges to share their authority with nonjudges undermines the integrity of the Judicial Branch.

The Act provides in part: "At least three of [the Commission's] members shall be Federal judges selected [by the President] after considering a list of six judges recommended to the President by the Judicial Conference of the United States." 28 U. S. C. § 991(a). Petitioner urges us to strike down the Act on the ground that its requirement of judicial participation on the Commission unconstitutionally conscripts individual federal judges for political service and thereby undermines the essential impartiality of the Judicial Branch. We find Congress' requirement of judicial service somewhat troublesome, but we do not believe that the Act impermissibly interferes with the functioning of the Judiciary.

The text of the Constitution contains no prohibition against the service of active federal judges on independent commissions such as that established by the Act. The Constitution does include an Incompatibility Clause applicable to national legislators:

> "No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a

Member of either House during his Continuance in Office."   U. S. Const., Art. I, § 6, cl. 2.

No comparable restriction applies to judges, and we find it at least inferentially meaningful that at the Constitutional Convention two prohibitions against plural officeholding by members of the Judiciary were proposed, but did not reach the floor of the Convention for a vote.[21]

Our inferential reading that the Constitution does not prohibit Article III judges from undertaking extrajudicial duties finds support in the historical practice of the Founders after ratification.   Our early history indicates that the Framers themselves did not read the Constitution as forbidding extrajudicial service by federal judges.   The first Chief Justice, John Jay, served simultaneously as Chief Justice and as Ambassador to England, where he negotiated the treaty that bears his name.   Oliver Ellsworth served simultaneously as

---

[21] One such prohibition appeared in the New Jersey Plan's judiciary provision, see 1 M. Farrand, The Records of the Federal Convention of 1787, p. 244 (1911); the other, proposed by Charles Pinckney, a delegate from South Carolina, was not reported out of the Committee on Detail to which he submitted it, see 2 *id.*, at 341–342.   See also Wheeler, Extrajudicial Activities of the Early Supreme Court, 1973 S. Ct. Rev. 123.   Concededly, it is also true that the delegates at the Convention rejected two proposals that would have institutionalized extrajudicial service.   Despite support from Madison, the Framers rejected a proposed "Council of Revision," comprised of, among others, a "convenient number of the National Judiciary," 1 Farrand, *supra*, at 21, that would have exercised veto power over proposed legislation.   Similarly, the Framers rejected a proposed "Council of State," of which the Chief Justice was to be a member, that would have acted as adviser to the President in a fashion similar to the modern cabinet. See Lerner, The Supreme Court as Republican Schoolmaster, 1967 S. Ct. Rev. 127, 174–177.   At least one commentator has observed that a number of the opponents of the Council of Revision and the Council of State believed that judges individually could assume extrajudicial service.   Wheeler, *supra*, at 127–130.   We do not pretend to discern a clear intent on the part of the Framers with respect to this issue, but glean from the Constitution and the events at the Convention simply an inference that the Framers did not intend to forbid judges to hold extrajudicial positions.   See *United States* v. *Nixon*, 418 U. S. 683, 705–706, n. 16 (1974).

Chief Justice and as Minister to France. While he was Chief Justice, John Marshall served briefly as Secretary of State and was a member of the Sinking Fund Commission with responsibility for refunding the Revolutionary War debt.

All these appointments were made by the President with the "Advice and Consent" of the Senate. Thus, at a minimum, both the Executive and Legislative Branches acquiesced in the assumption of extrajudicial duties by judges. In addition, although the records of Congress contain no reference to the confirmation debate, Charles Warren, in his history of this Court, reports that the Senate specifically rejected by a vote of 18 to 8 a resolution proposed during the debate over Jay's nomination to the effect that such extrajudicial service was "contrary to the spirit of the Constitution." 1 C. Warren, The Supreme Court in United States History 119 (rev. ed. 1937). This contemporaneous practice by the Founders themselves is significant evidence that the constitutional principle of separation of powers does not absolutely prohibit extrajudicial service. See *Bowsher* v. *Synar*, 478 U. S., at 723–724 (actions by Members of the First Congress provide contemporaneous and weighty evidence about the meaning of the Constitution).[22]

---

[22] It would be naive history, however, to suggest that the Framers, including the Justices who accepted extrajudicial service, were of one mind on the issue or believed that such service was in all cases appropriate and constitutional. Chief Justice Jay, in draft correspondence to President Washington, explained that he was "far from thinking it illegal or unconstitutional," for the Executive to use individual judges for extrajudicial service so long as the extrajudicial service was "consistent and compatible" with "the judicial function." Draft of a letter by Jay, intended for President Washington, enclosed with a letter dated September 15, 1790, from Jay to Justice Iredell, reproduced in 2 G. McRee, Life and Correspondence of James Iredell 293, 294 (1949). Chief Justice Marshall stepped down from his post as Secretary of State when appointed to the bench, agreeing to stay on only until a replacement could be found. Chief Justice Ellsworth accepted his posting to France with reluctance and his appointment was unsuccessfully opposed on constitutional grounds by Jefferson, Madison, and Pinckney. But that some judges have turned down extrajudicial

Subsequent history, moreover, reveals a frequent and continuing, albeit controversial, practice of extrajudicial service.[23]  In 1877, five Justices served on the Election Commission that resolved the hotly contested Presidential election of 1876, where Samuel J. Tilden and Rutherford B. Hayes were the contenders.   Justices Nelson, Fuller, Brewer, Hughes, Day, Roberts, and Van Devanter served on various arbitral commissions.   Justice Roberts was a member of the commission organized to investigate the attack on Pearl Harbor. Justice Jackson was one of the prosecutors at the Nuremberg trials; and Chief Justice Warren presided over the commission investigating the assassination of President Kennedy.[24]   Such service has been no less a practice among lower court federal judges.[25]   While these extrajudicial activities spawned spir-

---

service or have expressed reservations about the practice, see Mason, Extra-Judicial Work for Judges: The Views of Chief Justice Stone, 67 Harv. L. Rev. 193 (1953), does not detract from the fact that judges have continued to assume extrajudicial duties, and efforts to curb the practice as contrary to the letter or spirit of the Constitution have not succeeded. But see Note, The Constitutional Infirmities of the United States Sentencing Commission, 96 Yale L. J. 1363, 1381–1385 (1987).

[23] Compendia of extrajudicial activities may be found in several sources. See Mason, *supra;* McKay, The Judiciary and Nonjudicial Activities, 35 Law & Contemp. Prob. 9 (1970); Slonim, Extrajudicial Activities and the Principle of the Separation of Powers, 49 Conn. B. J. 391 (1975).   See also *In re President's Comm'n on Organized Crime,* 783 F. 2d 370 (CA3 1986).

[24] Article III judges, and the Chief Justice in particular, also have served and continue to serve on numerous cultural commissions.   The Chief Justice by statute is a member of the Board of Regents of the Smithsonian Institution, Rev. Stat. § 5580, as amended, 20 U. S. C. § 42, and a trustee of the National Gallery of Art, 50 Stat. 52, 20 U. S. C. § 72(a).   Four Justices, pursuant to 44 U. S. C. § 2501, have served successively as the judiciary member of the National Historical Publications and Records Commission.   And Chief Justice Burger began his service as Chairman of the Commission on the Bicentennial of the United States Constitution before he assumed retirement status.   See Pub. L. 98–101, 97 Stat. 719.

[25] For example, Judges A. Leon Higginbotham, Jr., James B. Parsons, Luther W. Youngdahl, George C. Edwards, Jr., James M. Carter, and

ited discussion and frequent criticism, and although some of the judges who undertook these duties sometimes did so with reservation and may have looked back on their service with regret, "traditional ways of conducting government . . . give meaning" to the Constitution. *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S., at 610 (concurring opinion). Our 200-year tradition of extrajudicial service is additional evidence that the doctrine of separated powers does not prohibit judicial participation in certain extrajudicial activity.[26]

Thomas J. MacBride, and others, have served on various Presidential and national commissions. See Brief for United States 48, n. 40.

[26] Extrajudicial activity has been the subject of extensive testimony in Congress from federal judges, academics, legislators, and members of the legal community. See Nonjudicial Activities of Supreme Court Justices and other Federal Judges, Hearings before the Subcommittee on Separation of Powers of the Senate Committee on the Judiciary, 91st Cong., 1st Sess. (1969). Although many participants were critical of extrajudicial service, the testimony shed little light on what types of service were not merely unwise, but unconstitutional.

Perhaps the most interesting lament on the subject comes from Chief Justice Warren reflecting on his initial refusal to participate in the commission looking into President Kennedy's death:

"First, it is not in the spirit of constitutional separation of powers to have a member of the Supreme Court serve on a presidential commission; second, it would distract a Justice from the work of the Court, which had a heavy docket; and, third, it was impossible to foresee what litigation such a commission might spawn, with resulting disqualification of the Justice from sitting in such cases. I then told them that, historically, the acceptance of diplomatic posts by Chief Justices Jay and Ellsworth had not contributed to the welfare of the Court, that the service of five Justices on the Hayes-Tilden Commission had demeaned it, that the appointment of Justice Roberts as chairman to investigate the Pearl Harbor disaster had served no good purpose, and that the action of Justice Robert Jackson in leaving Court for a year to become chief prosecutor at Nürnberg after World War II had resulted in divisiveness and internal bitterness on the Court." E. Warren, The Memoirs of Earl Warren 356 (1977).

Despite his initial reservations, the Chief Justice served as Chairman of the commission and endured criticism for so doing.

Furthermore, although we have not specifically addressed the constitutionality of extrajudicial service, two of our precedents reflect at least an early understanding by this Court that the Constitution does not preclude judges from assuming extrajudicial duties in their individual capacities. In *Hayburn's Case*, 2 Dall. 409 (1792), the Court considered a request for a writ of mandamus ordering a Circuit Court to execute a statute empowering federal and state courts to set pensions for disabled Revolutionary War veterans. The statute authorized the courts to determine monthly disability payments, but it made those determinations reviewable by the Secretary of War. Because Congress by an amendment of the statute rendered the case moot, the Court did not pass on the constitutional issue. Mr. Dallas, in reporting the case, included in the margin three Circuit Court rulings on the statute. All three concluded that the powers conferred could not be performed by an Article III court. The "judicial Power" of the United States did not extend to duties more properly performed by the Executive. See *Morrison* v. *Olson*, 487 U. S., at 677–678, n. 15 (characterizing *Hayburn's Case*). As this Court later observed in *United States* v. *Ferreira*, 13 How. 40 (1852), however, the New York Circuit, in 1791, with a bench consisting of Chief Justice Jay, Justice Cushing, and District Judge Duane, believed that individual judges acting not in their judicial capacities but as individual commissioners could exercise the duties conferred upon them by the statute. Neither of the other two courts expressed a definitive view whether judges acting as commissioners could make disability determinations reviewable by the Secretary of War. In *Ferreira*, however, this Court concluded that although the Circuit Courts were not fully in agreement as to whether the statute could be construed as conferring the duties on the judges as commissioners, if the statute was subject to that construction "there seems to have been no doubt,

at that time, but that they might constitutionally exercise it, and the Secretary constitutionally revise their decisions." *Id.*, at 50.

*Ferreira* itself concerned a statute authorizing a Federal District Court in Florida to adjudicate claims for losses for which the United States was responsible under the 1819 treaty by which Spain ceded Florida to the United States. As in *Hayburn's Case,* the court's determination was to be reported to an executive officer, the Secretary of the Treasury, who would exercise final judgment as to whether the claims should be paid. 13 How., at 45–47. This Court recognized that the powers conferred on the District Court were "judicial in their nature," in the sense that they called for "judgment and discretion." *Id.*, at 48. Nonetheless, we concluded that those powers were not "judicial . . . in the sense in which judicial power is granted by the Constitution to the courts of the United States." *Ibid.* Because the District Court's decision was not an exercise of judicial power, this Court found itself without jurisdiction to hear the appeal. *Id.*, at 51–52.

We did not conclude in *Ferreira,* however, that Congress could not confer on a federal judge the function of resolving administrative claims. On the contrary, we expressed general agreement with the view of some of the judges in *Hayburn's Case* that while such administrative duties could not be assigned to a court, or to judges acting as part of a court, such duties could be assigned to judges acting individually as commissioners. Although we did not decide the question, we expressed reservation about whether the District Judge in Florida could act legitimately as a commissioner since he was not appointed as such by the President pursuant to his Article II power to appoint officers of the United States. 13 How., at 51. In sum, *Ferreira*, like *Hayburn's Case,* suggests that Congress may authorize a federal judge, in an individual capacity, to perform an executive function without violating the separation of powers.

Accord, *United States* v. *Yale Todd* (1794) (unreported decision discussed in the margin of the opinion in *Ferreira*, 13 How., at 52–53).

In light of the foregoing history and precedent, we conclude that the principle of separation of powers does not absolutely prohibit Article III judges from serving on commissions such as that created by the Act. The judges serve on the Sentencing Commission not pursuant to their status and authority as Article III judges, but solely because of their appointment by the President as the Act directs. Such power as these judges wield as Commissioners is not judicial power; it is administrative power derived from the enabling legislation. Just as the nonjudicial members of the Commission act as administrators, bringing their experience and wisdom to bear on the problems of sentencing disparity, so too the judges, uniquely qualified on the subject of sentencing, assume a wholly administrative role upon entering into the deliberations of the Commission. In other words, the Constitution, at least as a *per se* matter, does not forbid judges to wear two hats; it merely forbids them to wear both hats at the same time.

This is not to suggest, of course, that every kind of extrajudicial service under every circumstance necessarily accords with the Constitution. That the Constitution does not absolutely prohibit a federal judge from assuming extrajudicial duties does not mean that every extrajudicial service would be compatible with, or appropriate to, continuing service on the bench; nor does it mean that Congress may require a federal judge to assume extrajudicial duties as long as the judge is assigned those duties in an individual, not judicial, capacity. The ultimate inquiry remains whether a particular extrajudicial assignment undermines the integrity of the Judicial Branch.[27]

---

[27] The effect of extrajudicial service on the functioning of the Judicial Branch is not solely a constitutional concern. The Code of Conduct for United States Judges, approved by the Judicial Conference of the United

With respect to the Sentencing Commission, we understand petitioner to argue that the service required of at least three judges presents two distinct threats to the integrity of the Judicial Branch. Regardless of constitutionality, this mandatory service, it is said, diminishes the independence of the Judiciary. See Brief for Petitioner 28. It is further claimed that the participation of judges on the Commission improperly lends judicial prestige and an aura of judicial impartiality to the Commission's political work. The involvement of Article III judges in the process of policy-making, petitioner asserts, "'[w]eakens confidence in the disinterestedness of the judicatory functions.'" *Ibid.*, quoting F. Frankfurter, Advisory Opinions, in 1 Encyclopedia of the Social Sciences 475, 478 (1930).

In our view, petitioner significantly overstates the mandatory nature of Congress' directive that at least three members of the Commission shall be federal judges, as well as the effect of this service on the practical operation of the Judicial Branch. Service on the Commission by any particular judge is voluntary. The Act does not conscript judges for the Commission. No Commission member to date has been appointed without his consent and we have no reason to believe that the Act confers upon the President any authority to

States, is intended to ensure that a judge does not accept extrajudicial service incompatible with the performance of judicial duties or that might compromise the integrity of the Branch as a whole. Canon 5(G) provides:

"A judge should not accept appointment to a governmental committee, commission, or other position that is concerned with issues of fact or policy on matters other than the improvement of the law, the legal system, or the administration of justice, unless appointment of a judge is required by Act of Congress. A judge should not, in any event, accept such an appointment if the judge's governmental duties would interfere with the performance of judicial duties or tend to undermine the public confidence in the integrity, impartiality, or independence of the judiciary . . . ." Administrative Office of U. S. Courts, Code of Judicial Conduct for United States Judges (1987).

force a judge to serve on the Commission against his will.[28] Accordingly, we simply do not face the question whether Congress may require a particular judge to undertake the extrajudicial duty of serving on the Commission. In *Chandler* v. *Judicial Council*, 398 U. S. 74 (1970), we found "no constitutional obstacle preventing Congress from vesting in the Circuit Judicial Councils, as administrative bodies," authority to administer "'the business of the courts within [each] circuit.'" *Id.*, at 86, n. 7, quoting 28 U. S. C. § 332 (1970 ed.).[29] Indeed, Congress has created numerous nonadjudicatory bodies, such as the Judicial Conference, that are composed entirely, or in part, of federal judges. See 28 U. S. C. §§ 331, 332; see generally Meador, The Federal Judiciary and Its Future Administration, 65 Va. L. Rev. 1031 (1979). Accordingly, absent a more specific threat to judicial independence, the fact that Congress has included federal judges on the Commission does not itself threaten the integrity of the Judicial Branch.

Moreover, we cannot see how the service of federal judges on the Commission will have a constitutionally significant practical effect on the operation of the Judicial Branch. We see no reason why service on the Commission should result in widespread judicial recusals. That federal judges partici-

---

[28] Certainly nothing in the Act creates any coercive power over members of the Judicial Branch and we construe the statute as affording none. "[I]t is the duty of federal courts to construe a statute in order to save it from constitutional infirmities, see, *e. g.*, *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833, 841 (1986)." *Morrison* v. *Olson*, 487 U. S., at 682.

[29] Notably, the statutory provision creating the Judicial Councils of the Circuits that we found constitutionally unobjectionable in *Chandler* requires the Chief Judge of each Court of Appeals to preside over his Circuit's Judicial Council. 28 U. S. C. § 332. The statutory provision creating the Judicial Conference of the United States also requires the service of the Chief Judge of each Court of Appeals. 28 U. S. C. § 331 (1982 ed. and Supp. IV). Thus, we have given at least tacit approval to this degree of congressionally mandated judicial service on nonadjudicatory bodies.

pate in the promulgation of guidelines does not affect their or other judges' ability impartially to adjudicate sentencing issues. Cf. *Mississippi Publishing Corp.* v. *Murphree*, 326 U. S. 438 (1946) (that this Court promulgated the Federal Rules of Civil Procedure did not foreclose its consideration of challenges to their validity). While in the abstract a proliferation of commissions with congressionally mandated judiciary participation might threaten judicial independence by exhausting the resources of the Judicial Branch, that danger is far too remote for consideration here.

We are somewhat more troubled by petitioner's argument that the Judiciary's entanglement in the political work of the Commission undermines public confidence in the disinterestedness of the Judicial Branch. While the problem of individual bias is usually cured through recusal, no such mechanism can overcome the appearance of institutional partiality that may arise from judiciary involvement in the making of policy. The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship. That reputation may not be borrowed by the political Branches to cloak their work in the neutral colors of judicial action.

Although it is a judgment that is not without difficulty, we conclude that the participation of federal judges on the Sentencing Commission does not threaten, either in fact or in appearance, the impartiality of the Judicial Branch. We are drawn to this conclusion by one paramount consideration: that the Sentencing Commission is devoted exclusively to the development of rules to rationalize a process that has been and will continue to be performed exclusively by the Judicial Branch. In our view, this is an essentially neutral endeavor and one in which judicial participation is peculiarly appropriate. Judicial contribution to the enterprise of creating rules to limit the discretion of sentencing judges does not enlist the resources or reputation of the Judicial Branch in either the legislative business of determining what conduct should be criminalized or the executive business of enforcing the law.

Rather, judicial participation on the Commission ensures that judicial experience and expertise will inform the promulgation of rules for the exercise of the Judicial Branch's own business — that of passing sentence on every criminal defendant. To this end, Congress has provided, not inappropriately, for a significant judicial voice on the Commission.

Justice Jackson underscored in *Youngstown* that the Constitution anticipates "reciprocity" among the Branches. 343 U. S., at 635. As part of that reciprocity and as part of the integration of dispersed powers into a workable government, Congress may enlist the assistance of judges in the creation of rules to govern the Judicial Branch. Our principle of separation of powers anticipates that the coordinate Branches will converse with each other on matters of vital common interest. While we have some reservation that Congress required such a dialogue in this case, the Constitution does not prohibit Congress from enlisting federal judges to present a uniquely judicial view on the uniquely judicial subject of sentencing. In this case, at least, where the subject lies so close to the heart of the judicial function and where purposes of the Commission are not inherently partisan, such enlistment is not coercion or co-optation, but merely assurance of judicial participation.

Finally, we reject petitioner's argument that the mixed nature of the Commission violates the Constitution by requiring Article III judges to share judicial power with nonjudges. As noted earlier, the Commission is not a court and exercises no judicial power. Thus, the Act does not vest Article III power in nonjudges or require Article III judges to share their power with nonjudges.

## C

### Presidential Control

The Act empowers the President to appoint all seven members of the Commission with the advice and consent of the Senate. The Act further provides that the President shall make his choice of judicial appointees to the Commission after considering a list of six judges recommended by the Ju-

dicial Conference of the United States. The Act also grants the President authority to remove members of the Commission, although "only for neglect of duty or malfeasance in office or for other good cause shown." 28 U. S. C. § 991(a).

Mistretta argues that this power of Presidential appointment and removal prevents the Judicial Branch from performing its constitutionally assigned functions.[30] See *Nixon* v. *Administrator of General Services*, 433 U. S., at 443. Although we agree with petitioner that the independence of the Judicial Branch must be "jealously guarded" against outside interference, see *Northern Pipeline Co.* v. *Marathon Pipe Line Co.*, 458 U. S., at 60, and that, as Madison admonished at the founding, "neither of [the Branches] ought to possess directly or indirectly, an overruling influence over the others in the administration of their respective powers," The Federalist No. 48, p. 332 (J. Cooke ed. 1961), we do not believe that the President's appointment and removal powers over the Commission afford him influence over the functions of the Judicial Branch or undue sway over its members.

The notion that the President's power to appoint federal judges to the Commission somehow gives him influence over the Judicial Branch or prevents, even potentially, the Judicial Branch from performing its constitutionally assigned functions is fanciful. We have never considered it incompatible with the functioning of the Judicial Branch that the President has the power to elevate federal judges from one level to another or to tempt judges away from the bench with Executive Branch positions. The mere fact that the President within his appointment portfolio has positions that may be attractive to federal judges does not, of itself, corrupt the integrity of the Judiciary. Were the impartiality of the Judi-

---

[30] Petitioner does not raise the issue central to our most recent opinions discussing removal power, namely, whether Congress unconstitutionally has limited the President's authority to remove officials engaged in executive functions or has reserved for itself excessive removal power over such officials. See *Morrison* v. *Olson*, 487 U. S. 654 (1988); *Bowsher* v. *Synar*, 478 U. S. 714 (1986).

cial Branch so easily subverted, our constitutional system of tripartite Government would have failed long ago. We simply cannot imagine that federal judges will comport their actions to the wishes of the President for the purpose of receiving an appointment to the Sentencing Commission.[31]

The President's removal power over Commission members poses a similarly negligible threat to judicial independence. The Act does not, and could not under the Constitution, authorize the President to remove, or in any way diminish the status of Article III judges, as judges. Even if removed from the Commission, a federal judge appointed to the Commission would continue, absent impeachment, to enjoy tenure "during good Behaviour" and a full judicial salary. U. S. Const., Art. III, § 1.[32] Also, the President's removal power under the Act is limited. In order to safeguard the independence of the Commission from executive control, Congress specified in the Act that the President may remove the Commission members only for good cause.[33] Such con-

[31] Moreover, as has been noted, the Act limits the President's power to use his appointments to the Commission for political purposes by explicitly requiring that he consider a list of six judges submitted by the Judicial Conference before making his selections. Senator Hart explained that this provision provided "greater assurance that a broad range of interests will be represented." 124 Cong. Rec. 378 (1978).

[32] The textual requirements of Article III that judges shall enjoy tenure and be paid an irreducible compensation "were incorporated into the Constitution to ensure the independence of the Judiciary from control of the Executive and Legislative Branches of government." *Northern Pipeline Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 59 (1982). These inviolable guarantees are untrammeled by the Act. Concededly, since Commission members receive a salary equal to that of a court of appeals judge, 28 U. S. C. § 992(c), district court judges appointed to the Commission receive an increase in salary. We do not address the hypothetical constitutional question whether, under the Compensation Clause of Article III, a district judge removed from the Commission must continue to be paid the higher salary.

[33] This removal provision is precisely the kind that was at issue in *Humphrey's Executor* v. *United States* where we wrote: "The authority of Congress, in creating quasi-legislative or quasi-judicial agencies, to require

gressional limitation on the President's removal power, like the removal provisions upheld in *Morrison* v. *Olson*, 487 U. S. 654 (1988), and *Humphrey's Executor* v. *United States*, 295 U. S. 602 (1935), is specifically crafted to prevent the President from exercising "coercive influence" over independent agencies.   See *Morrison*, 487 U. S., at 688; *Humphrey's Executor*, 295 U. S., at 630.

In other words, since the President has no power to affect the tenure or compensation of Article III judges, even if the Act authorized him to remove judges from the Commission at will, he would have no power to coerce the judges in the exercise of their judicial duties.[34]   In any case, Congress did not grant the President unfettered authority to remove Commission members.   Instead, precisely to ensure that they would not be subject to coercion even in the exercise of their nonjudicial duties, Congress insulated the members from Presidential removal except for good cause.   Under these circumstances, we see no risk that the President's limited removal power will compromise the impartiality of Article III judges serving on the Commission and, consequently, no risk that the Act's removal provision will prevent the Judicial Branch from performing its constitutionally assigned function of fairly adjudicating cases and controversies.[35]

---

them to act in discharge of their duties independently of executive control cannot well be doubted; and that authority includes, as an appropriate incident, power to fix the period during which [commissioners] shall continue in office, and to forbid their removal except for cause in the meantime." 295 U. S., at 629.

[34] Although removal from the Sentencing Commission conceivably could involve some embarrassment or even damage to reputation, each judge made potentially subject to these injuries will have undertaken the risk voluntarily by accepting the President's appointment to serve.

[35] *Bowsher* v. *Synar*, 478 U. S. 714 (1986), is not to the contrary.   In *Bowsher*, we held that "Congress cannot reserve for itself the power of removal of an officer charged with the execution of the laws except by impeachment." *Id.*, at 726.   To permit Congress to remove an officer performing executive functions whenever Congress might find the performance of his duties unsatisfactory would, in essence, give Congress

## V

We conclude that in creating the Sentencing Commission—an unusual hybrid in structure and authority—Congress neither delegated excessive legislative power nor upset the constitutionally mandated balance of powers among the coordinate Branches. The Constitution's structural protections do not prohibit Congress from delegating to an expert body located within the Judicial Branch the intricate task of formulating sentencing guidelines consistent with such significant statutory direction as is present here. Nor does our system of checked and balanced authority prohibit Congress from calling upon the accumulated wisdom and experience of the Judicial Branch in creating policy on a matter uniquely within the ken of judges. Accordingly, we hold that the Act is constitutional.

The judgment of United States District Court for the Western District of Missouri is affirmed.

*It is so ordered.*

---

veto power over executive action. In light of the special danger recognized by the Founders of congressional usurpation of Executive Branch functions, "[t]his kind of congressional control over the execution of the laws . . . is constitutionally impermissible." *Id.*, at 726–727.

Nothing in *Bowsher*, however, suggests that one Branch may never exercise removal power, however limited, over members of another Branch. Indeed, we already have recognized that the President may remove a judge who serves on an Article I court. *McAllister* v. *United States*, 141 U. S. 174, 185 (1891). In any event, we hold here no more than that Congress may vest in the President the power to remove for good cause an Article III judge from a nonadjudicatory independent agency placed within the Judicial Branch. Because an Article III judge serving on a nonadjudicatory commission is not exercising judicial power, and because such limited removal power gives the President no control over judicatory functions, interbranch removal authority under these limited circumstances poses no threat to the balance of power among the Branches. Our paramount concern in *Bowsher* that Congress was accreting to itself the power to control the functions of another Branch is not implicated by a removal provision, like the one at issue here, which provides no control in one Branch over the constitutionally assigned mission of another Branch.

JUSTICE SCALIA, dissenting.

While the products of the Sentencing Commission's labors have been given the modest name "Guidelines," see 28 U. S. C. § 994(a)(1) (1982 ed., Supp. IV); United States Sentencing Commission Guidelines Manual (June 15, 1988), they have the force and effect of laws, prescribing the sentences criminal defendants are to receive. A judge who disregards them will be reversed, 18 U. S. C. § 3742 (1982 ed., Supp. IV). I dissent from today's decision because I can find no place within our constitutional system for an agency created by Congress to exercise no governmental power other than the making of laws.

I

There is no doubt that the Sentencing Commission has established significant, legally binding prescriptions governing application of governmental power against private individuals—indeed, application of the ultimate governmental power, short of capital punishment.[1] Statutorily permissible sentences for particular crimes cover as broad a range as zero years to life, see, e. g., 18 U. S. C. § 1201 (1982 ed. and Supp. IV) (kidnaping), and within those ranges the Commission was given broad discretion to prescribe the "correct" sentence, 28 U. S. C. § 994(b)(2) (1982 ed., Supp. IV). Average prior sentences were to be a starting point for the Commission's inquiry, § 994(m), but it could and regularly did deviate from those averages as it thought appropriate. It chose, for example, to prescribe substantial increases over average prior sentences for white-collar crimes such as public corruption, antitrust violations, and tax evasion. Guidelines,

---

[1] It is even arguable that the Commission has authority to establish guidelines and procedures for imposing the death penalty, thus reinstituting that sanction under federal statutes for which (by reason of our recent decisions) it has been thought unusable because of constitutionally inadequate procedures. The Justice Department believes such authority exists, and has encouraged the Commission to exercise it. See Gubiensio-Ortiz v. Kanahele, 857 F. 2d 1245, 1256 (CA9 1988).

at 2.31, 2.133, 2.140. For antitrust violations, before the Guidelines, only 39% of those convicted served any imprisonment, and the average imprisonment was only 45 days, *id.*, at 2.133, whereas the Guidelines prescribe base sentences (for defendants with no prior criminal conviction) ranging from 2-to-8 months to 10-to-16 months, depending upon the volume of commerce involved. See *id.*, at 2.131, 5.2.

The Commission also determined when probation was permissible, imposing a strict system of controls because of its judgment that probation had been used for an "inappropriately high percentage of offenders guilty of certain economic crimes." *Id.*, at 1.8. Moreover, the Commission had free rein in determining whether statutorily authorized fines should be imposed in addition to imprisonment, and if so, in what amounts. It ultimately decided that every nonindigent offender should pay a fine according to a schedule devised by the Commission. *Id.*, at 5.18. Congress also gave the Commission discretion to determine whether 7 specified characteristics of offenses, and 11 specified characteristics of offenders, "have any relevance," and should be included among the factors varying the sentence. 28 U. S. C. §§ 994(c), (d) (1982 ed., Supp. IV). Of the latter, it included only three among the factors required to be considered, and declared the remainder not ordinarily relevant. Guidelines, at 5.29–5.31.

It should be apparent from the above that the decisions made by the Commission are far from technical, but are heavily laden (or ought to be) with value judgments and policy assessments. This fact is sharply reflected in the Commission's product, as described by the dissenting Commissioner:

> "Under the guidelines, the judge could give the same sentence for abusive sexual contact that puts the child in fear as for unlawfully entering or remaining in the United States. Similarly, the guidelines permit equivalent sentences for the following pairs of offenses: drug

trafficking and a violation of the Wild Free-Roaming Horses and Burros Act; arson with a destructive device and failure to surrender a cancelled naturalization certificate; operation of a common carrier under the influence of drugs that causes injury and alteration of one motor vehicle identification number; illegal trafficking in explosives and trespass; interference with a flight attendant and unlawful conduct relating to contraband cigarettes; aggravated assault and smuggling $11,000 worth of fish." Dissenting View of Commissioner Paul H. Robinson on the Promulgation of the Sentencing Guidelines by the United States Sentencing Commission 6–7 (May 1, 1987) (citations omitted).

Petitioner's most fundamental and far-reaching challenge to the Commission is that Congress' commitment of such broad policy responsibility to any institution is an unconstitutional delegation of legislative power. It is difficult to imagine a principle more essential to democratic government than that upon which the doctrine of unconstitutional delegation is founded: Except in a few areas constitutionally committed to the Executive Branch, the basic policy decisions governing society are to be made by the Legislature. Our Members of Congress could not, even if they wished, vote all power to the President and adjourn *sine die*.

But while the doctrine of unconstitutional delegation is unquestionably a fundamental element of our constitutional system, it is not an element readily enforceable by the courts. Once it is conceded, as it must be, that no statute can be entirely precise, and that some judgments, even some judgments involving policy considerations, must be left to the officers executing the law and to the judges applying it, the debate over unconstitutional delegation becomes a debate not over a point of principle but over a question of degree. As Chief Justice Taft expressed the point for the Court in the landmark case of *J. W. Hampton, Jr., & Co.* v. *United*

*States*, 276 U. S. 394, 406 (1928), the limits of delegation "must be fixed according to common sense and the inherent necessities of the governmental co-ordination." Since Congress is no less endowed with common sense than we are, and better equipped to inform itself of the "necessities" of government; and since the factors bearing upon those necessities are both multifarious and (in the nonpartisan sense) highly political—including, for example, whether the Nation is at war, see *Yakus* v. *United States*, 321 U. S. 414 (1944), or whether for other reasons "emergency is instinct in the situation," *Amalgamated Meat Cutters and Butcher Workmen of North America* v. *Connally*, 337 F. Supp. 737, 752 (DC 1971) (three-judge court)—it is small wonder that we have almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law. As the Court points out, we have invoked the doctrine of unconstitutional delegation to invalidate a law only twice in our history, over half a century ago. See *Panama Refining Co.* v. *Ryan*, 293 U. S. 388 (1935); *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495 (1935). What legislated standard, one must wonder, can possibly be too vague to survive judicial scrutiny, when we have repeatedly upheld, in various contexts, a "public interest" standard? See, *e. g.*, *National Broadcasting Co.* v. *United States*, 319 U. S. 190, 216–217 (1943); *New York Central Securities Corp.* v. *United States*, 287 U. S. 12, 24–25 (1932).

In short, I fully agree with the Court's rejection of petitioner's contention that the doctrine of unconstitutional delegation of legislative authority has been violated because of the lack of intelligible, congressionally prescribed standards to guide the Commission.

## II

Precisely because the scope of delegation is largely uncontrollable by the courts, we must be particularly rigorous in

preserving the Constitution's structural restrictions that deter excessive delegation. The major one, it seems to me, is that the power to make law cannot be exercised by anyone other than Congress, except in conjunction with the lawful exercise of executive or judicial power.

The whole theory of *lawful* congressional "delegation" is not that Congress is sometimes too busy or too divided and can therefore assign its responsibility of making law to someone else; but rather that a certain degree of discretion, and thus of lawmaking, *inheres* in most executive or judicial action, and it is up to Congress, by the relative specificity or generality of its statutory commands, to determine—up to a point—how small or how large that degree shall be. Thus, the courts could be given the power to say precisely what constitutes a "restraint of trade," see *Standard Oil Co. of New Jersey* v. *United States*, 221 U. S. 1 (1911), or to adopt rules of procedure, see *Sibbach* v. *Wilson & Co.*, 312 U. S. 1, 22 (1941), or to prescribe by rule the manner in which their officers shall execute their judgments, *Wayman* v. *Southard*, 10 Wheat. 1, 45 (1825), because that "lawmaking" was ancillary to their exercise of judicial powers. And the Executive could be given the power to adopt policies and rules specifying in detail what radio and television licenses will be in the "public interest, convenience or necessity," because that was ancillary to the exercise of its executive powers in granting and policing licenses and making a "fair and equitable allocation" of the electromagnetic spectrum. See *Federal Radio Comm'n* v. *Nelson Brothers Bond & Mortgage Co.*, 289 U. S. 266, 285 (1933).[2] Or to take examples closer to the case before us: Trial judges could be given the power to determine

---

[2] An executive agency can, of course, be created with no power other than the making of rules, as long as that agency is subject to the control of the President and the President has executive authority related to the rulemaking. In such circumstances, the rulemaking is ultimately ancillary to the President's executive powers.

what factors justify a greater or lesser sentence within the statutorily prescribed limits because that was ancillary to their exercise of the judicial power of pronouncing sentence upon individual defendants. And the President, through the Parole Commission subject to his appointment and removal, could be given the power to issue Guidelines specifying when parole would be available, because that was ancillary to the President's exercise of the executive power to hold and release federal prisoners. See 18 U. S. C. §§ 4203(a)(1) and (b); 28 CFR § 2.20 (1988).

As Justice Harlan wrote for the Court in *Field* v. *Clark*, 143 U. S. 649 (1892):

> " 'The true distinction . . . is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion *as to its execution*, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made.' " *Id.*, at 693–694 (emphasis added), quoting *Cincinnati, W. & Z. R. Co.* v. *Commissioners of Clinton County*, 1 Ohio St. 77, 88–89 (1852).

> " 'Half the statutes on our books are in the alternative, depending on the discretion of some person or persons to whom is confided the duty of determining *whether the proper occasion exists for executing them.* But it cannot be said that the exercise of such discretion is the making of the law.' " *Id.*, at 694 (emphasis added), quoting *Moers* v. *Reading*, 21 Pa. 188, 202 (1853).

In *United States* v. *Grimaud*, 220 U. S. 506, 517 (1911), which upheld a statutory grant of authority to the Secretary of Agriculture to make rules and regulations governing use of the public forests he was charged with managing, the Court said:

"From the beginning of the Government various acts have been passed conferring upon executive officers power to make rules and regulations—not for the government of their departments, *but for administering the laws which did govern.* None of these statutes could confer legislative power." (Emphasis added.)

Or, finally, as Chief Justice Taft described it in *Hampton & Co.*, 276 U. S., at 406:

"The field of Congress involves all and many varieties of legislative action, and Congress has found it frequently necessary to use officers of the Executive Branch, within defined limits, to secure the exact effect intended by its acts of legislation, by vesting discretion in such officers to make public regulations interpreting a statute *and directing the details of its execution,* even to the extent of providing for penalizing a breach of such regulations." (Emphasis added.)

The focus of controversy, in the long line of our so-called excessive delegation cases, has been whether the *degree* of generality contained in the authorization for exercise of executive or judicial powers in a particular field is so unacceptably high as to *amount to* a delegation of legislative powers. I say "so-called excessive delegation" because although that convenient terminology is often used, what is really at issue is whether there has been *any* delegation of legislative power, which occurs (rarely) when Congress authorizes the exercise of executive or judicial power without adequate standards. Strictly speaking, there is *no* acceptable delegation of legislative power. As John Locke put it almost 300 years ago, "[t]he power of the *legislative* being derived from the people by a positive voluntary grant and institution, can be no other, than what the positive grant conveyed, which being only to make *laws*, and not to make *legislators*, the *leg-*

*islative* can have no power to transfer their authority of making laws, and place it in other hands." J. Locke, Second Treatise of Government 87 (R. Cox ed. 1982) (emphasis added). Or as we have less epigrammatically said: "That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Field* v. *Clark, supra,* at 692. In the present case, however, a pure delegation of legislative power is precisely what we have before us. It is irrelevant whether the standards are adequate, because they are not standards related to the exercise of executive or judicial powers; they are, plainly and simply, standards for further legislation.

The lawmaking function of the Sentencing Commission is completely divorced from any responsibility for execution of the law or adjudication of private rights under the law. It is divorced from responsibility for execution of the law not only because the Commission is not said to be "located in the Executive Branch" (as I shall discuss presently, I doubt whether Congress can "locate" an entity within one Branch or another for constitutional purposes by merely saying so); but, more importantly, because the Commission neither exercises any executive power on its own, nor is subject to the control of the President who does. The only functions it performs, apart from prescribing the law, 28 U. S. C. §§ 994(a) (1), (3) (1982 ed., Supp. IV), conducting the investigations useful and necessary for prescribing the law, *e. g.,* §§ 995(a) (13), (15), (16), (21), and clarifying the intended application of the law that it prescribes, *e. g.,* §§ 994(a)(2), 995(a)(10), are data collection and intragovernmental advice giving and education, *e. g.,* §§ 995(a)(8), (9), (12), (17), (18), (20). These latter activities—similar to functions performed by congressional agencies and even congressional staff—neither determine nor affect private rights, and do not constitute an exercise of governmental power. See *Humphrey's Executor* v. *United States,* 295 U. S. 602, 628 (1935). And the Commis-

sion's lawmaking is completely divorced from the exercise of judicial powers since, not being a court, it has no judicial powers itself, nor is it subject to the control of any other body with judicial powers. The power to make law at issue here, in other words, is not ancillary but quite naked. The situation is no different in principle from what would exist if Congress gave the same power of writing sentencing laws to a congressional agency such as the General Accounting Office, or to members of its staff.

The delegation of lawmaking authority to the Commission is, in short, unsupported by any legitimating theory to explain why it is not a delegation of legislative power. To disregard structural legitimacy is wrong in itself—but since structure has purpose, the disregard also has adverse practical consequences. In this case, as suggested earlier, the consequence is to facilitate and encourage judicially uncontrollable delegation. Until our decision last Term in *Morrison* v. *Olson*, 487 U. S. 654 (1988), it could have been said that Congress could delegate lawmaking authority only at the expense of increasing the power of either the President or the courts. Most often, as a practical matter, it would be the President, since the judicial process is unable to conduct the investigations and make the political assessments essential for most policymaking. Thus, the need for delegation would have to be important enough to induce Congress to aggrandize its primary competitor for political power, and the recipient of the policymaking authority, while not Congress itself, would at least be politically accountable. But even after it has been accepted, pursuant to *Morrison*, that those exercising executive power need not be subject to the control of the President, Congress would still be more reluctant to augment the power of even an independent executive agency than to create an otherwise powerless repository for its delegation. Moreover, assembling the full-time senior personnel for an agency exercising executive powers is more difficult than borrowing other officials (or employing new officers on a

short-term basis) to head an organization such as the Sentencing Commission.

By reason of today's decision, I anticipate that Congress will find delegation of its lawmaking powers much more attractive in the future. If rulemaking can be entirely unrelated to the exercise of judicial or executive powers, I foresee all manner of "expert" bodies, insulated from the political process, to which Congress will delegate various portions of its lawmaking responsibility. How tempting to create an expert Medical Commission (mostly M.D.'s, with perhaps a few Ph.D.'s in moral philosophy) to dispose of such thorny, "no-win" political issues as the withholding of life-support systems in federally funded hospitals, or the use of fetal tissue for research. This is an undemocratic precedent that we set—not because of the scope of the delegated power, but because its recipient is not one of the three Branches of Government. The only governmental power the Commission possesses is the power to make law; and it is not the Congress.

### III

The strange character of the body that the Court today approves, and its incompatibility with our constitutional institutions, is apparent from that portion of the Court's opinion entitled "Location of the Commission." This accepts at the outset that the Commission is a "body within the Judicial Branch," *ante*, at 385, and rests some of its analysis upon that asserted reality. Separation-of-powers problems are dismissed, however, on the ground that "[the Commission's] powers are not united with the powers of the Judiciary in a way that has meaning for separation-of-powers analysis," since the Commission "is not a court, does not exercise judicial power, and is not controlled by or accountable to members of the Judicial Branch," *ante*, at 393. In light of the latter concession, I am at a loss to understand why the Commission is "within the Judicial Branch" in any sense that has relevance to today's discussion. I am sure that Congress can

divide up the Government any way it wishes, and employ whatever terminology it desires, for *non*constitutional purposes—for example, perhaps the statutory designation that the Commission is "within the Judicial Branch" places it outside the coverage of certain laws which say they are inapplicable to that Branch, such as the Freedom of Information Act, see 5 U. S. C. § 552(f) (1982 ed., Supp. IV). For such statutory purposes, Congress can define the term as it pleases. But since our subject here is the Constitution, to admit that that congressional designation "has [no] meaning for separation-of-powers analysis" is to admit that the Court must therefore decide for itself where the Commission *is* located for purposes of separation-of-powers analysis.

It would seem logical to decide the question of which Branch an agency belongs to on the basis of who controls its actions: If Congress, the Legislative Branch; if the President, the Executive Branch; if the courts (or perhaps the judges), the Judicial Branch. See, *e. g.*, *Bowsher* v. *Synar*, 478 U. S. 714, 727–732 (1986). In *Humphrey's Executor* v. *United States*, 295 U. S. 602 (1986), we approved the concept of an agency that was controlled by (and thus within) none of the Branches. We seem to have assumed, however, that that agency (the old Federal Trade Commission, before it acquired many of its current functions) exercised no governmental power whatever, but merely assisted Congress and the courts in the performance of their functions. See *id.*, at 628. Where no governmental power is at issue, there is no strict constitutional impediment to a "branchless" agency, since it is only "[a]ll legislative Powers," Art. I, § 1, "[t]he executive Power," Art. II, § 1, and "[t]he judicial Power," Art. III, § 1, which the Constitution divides into three departments. (As an example of a "branchless" agency exercising no governmental powers, one can conceive of an Advisory Commission charged with reporting to all three Branches, whose members are removable only for cause and are thus subject to the control of none of the Branches.) Over the years, however,

*Humphrey's Executor* has come in general contemplation to stand for something quite different—not an "independent agency" in the sense of an agency independent of all three Branches, but an "independent agency" in the sense of an agency *within* the Executive Branch (and thus authorized to exercise executive powers) independent of the control of the President.

We approved that concept last Term in *Morrison.* See 487 U. S., at 688–691. I dissented in that case, essentially because I thought that concept illogical and destructive of the structure of the Constitution. I must admit, however, that today's next step—recognition of an independent agency in the *Judicial* Branch—makes *Morrison* seem, by comparison, rigorously logical. "The Commission," we are told, "is an independent agency in every relevant sense." *Ante,* at 393. There are several problems with this. First, once it is acknowledged that an "independent agency" may be within *any* of the three Branches, and not merely within the Executive, then there really *is* no basis for determining what Branch such an agency belongs to, and thus what governmental powers it may constitutionally be given, except (what the Court today uses) Congress' say-so. More importantly, however, the concept of an "independent agency" simply does not translate into the legislative or judicial spheres. Although the Constitution says that "[t]he executive Power shall be vested in a President of the United States of America," Art. II, § 1, it was never thought that the President would have to exercise that power *personally.* He may generally authorize others to exercise executive powers, with full effect of law, in his place. See, *e. g., Wolsey* v. *Chapman,* 101 U. S. 755 (1880); *Williams* v. *United States,* 1 How. 290 (1843). It is already a leap from the proposition that a person who is not the President may exercise executive powers to the proposition we accepted in *Morrison* that a person who is *neither* the President *nor* subject to the President's control may exercise executive powers. But with

respect to the exercise of judicial powers (the business of the Judicial Branch) the platform for such a leap does not even exist. For unlike executive power, judicial and legislative powers have never been thought delegable. A judge may not leave the decision to his law clerk, or to a master. See *United States* v. *Raddatz*, 447 U. S. 667, 683 (1980); cf. *Runkle* v. *United States*, 122 U. S. 543 (1887). Senators and Members of the House may not send delegates to consider and vote upon bills in their place. See Rules of the House of Representatives, Rule VIII(3); Standing Rules of the United States Senate, Rule XII. Thus, however well established may be the "independent agencies" of the Executive Branch, here we have an anomaly beyond equal: an independent agency exercising governmental power on behalf of a Branch where all governmental power is supposed to be exercised personally by the judges of courts.[3]

Today's decision may aptly be described as the *Humphrey's Executor* of the Judicial Branch, and I think we will live to regret it. Henceforth there may be agencies "within the Judicial Branch" (whatever that means), exercising governmental powers, that are neither courts nor controlled by courts, nor even controlled by judges. If an "independent agency" such as this can be given the power to fix sentences previously exercised by district courts, I must assume that a similar agency can be given the powers to adopt rules of pro-

---

[3] There are of course agencies within the Judicial Branch (because they operate under the control of courts or judges) which are not themselves courts, see, *e. g.*, 28 U. S. C. § 601 *et seq.* (Administrative Office of the United States Courts), just as there are agencies within the Legislative Branch (because they operate under the control of Congress) which are not themselves Senators or Representatives, see, *e. g.*, 31 U. S. C. § 701 *et seq.* (General Accounting Office). But these agencies, unlike the Sentencing Commission, exercise no governmental powers, that is, they establish and determine neither private rights nor the prerogatives of the other Branches. They merely assist the courts and the Congress in *their* exercise of judicial and legislative powers.

cedure and rules of evidence previously exercised by this Court. The bases for distinction would be thin indeed.

*    *    *

Today's decision follows the regrettable tendency of our recent separation-of-powers jurisprudence, see *Morrison, supra; Young* v. *United States ex rel. Vuitton et Fils S. A.,* 481 U. S. 787 (1987), to treat the Constitution as though it were no more than a generalized prescription that the functions of the Branches should not be commingled too much— how much is too much to be determined, case-by-case, by this Court. The Constitution is not that. Rather, as its name suggests, it is a prescribed structure, a framework, for the conduct of government. In designing that structure, the Framers *themselves* considered how much commingling was, in the generality of things, acceptable, and set forth their conclusions in the document. That is the meaning of the statements concerning acceptable commingling made by Madison in defense of the proposed Constitution, and now routinely used as an excuse for disregarding it. When he said, as the Court correctly quotes, that separation of powers "'d[oes] not mean that these [three] departments ought to have no *partial agency* in, or no *controul* over the acts of each other,'" *ante,* at 380–381, quoting The Federalist No. 47, pp. 325–326 (J. Cooke ed. 1961), his point was that the commingling specifically provided for in the structure that he and his colleagues had designed—the Presidential veto over legislation, the Senate's confirmation of executive and judicial officers, the Senate's ratification of treaties, the Congress' power to impeach and remove executive and judicial officers—did not violate a proper understanding of separation of powers. He would be aghast, I think, to hear those words used as justification for ignoring that carefully designed structure so long as, in the changing view of the Supreme Court from time to time, "too much commingling" does not occur. Consideration of the degree of commingling that a particular disposition produces may be appropriate at

the margins, where the outline of the framework itself is not clear; but it seems to me far from a marginal question whether our constitutional structure allows for a body which is not the Congress, and yet exercises no governmental powers except the making of rules that have the effect of laws.

I think the Court errs, in other words, not so much because it mistakes the degree of commingling, but because it fails to recognize that this case is not about commingling, but about the creation of a new Branch altogether, a sort of junior-varsity Congress. It may well be that in some circumstances such a Branch would be desirable; perhaps the agency before us here will prove to be so. But there are many desirable dispositions that do not accord with the constitutional structure we live under. And in the long run the improvisation of a constitutional structure on the basis of currently perceived utility will be disastrous.

I respectfully dissent from the Court's decision, and would reverse the judgment of the District Court.