**UNITED STATES of America**

v.

**Jaamar Julius KING, Tyrone Jackson Riley**

**No. 6:04–CR–35–ORL–31KRS.**

United States District Court,
M.D. Florida,
Orlando Division.

July 19, 2004.

Charles M. Greene, Law Office of Charles M. Greene, P.A., Orlando, FL, Andrew J. Chmelir, Andrew Chmelir, P.A., Winter Springs, FL, for Defendants.

## SENTENCING MEMORANDUM OPINION

PRESNELL, District Judge.

Defendants Tyrone Jackson Riley and Jaamar Julius King are minor combatants in the Government's war on drugs.[1] Each Defendant was charged with a drug-related offense and pled guilty after bargaining a plea with the Government. The Court

conducted a sentencing hearing in this case on July 19, 2004.

These are the first sentences imposed by this Court since the Supreme Court's ruling in *Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). The Government contends that *Blakely* does not impact these sentences because it does not seek any sentencing enhancements. For the reasons stated below, however, *Blakely* does impact these sentences, as well as every other sentence this Court will hand down hereinafter.

### I. Background

The case of Riley and King is a typical drug case where the offense itself was instigated by the Government's use of a proxy drug dealer. The circumstances of their crime are as follows: on November 5, 2003, King received a phone call from an undercover agent, who ordered $40 worth of cocaine base. The agent directed King to meet him at a hotel, and thereafter King and Riley went to the hotel room with the $40 worth of cocaine plus an additional piece, for a total of 1 gram. The same day, the agent ordered $500 worth of cocaine base, and after several phone calls that are irrelevant herein, Riley returned to the hotel room and delivered 4 grams of cocaine base. Similar hotel deliveries occurred on November 7 and December 2, 2003, during which Riley provided 2 grams of cocaine base in exchange for $240 and 1 gram in exchange for $100, and King provided 5.2 grams, at which time he was arrested. As a result of these "controlled" drug buys, each Defendant was charged in a one-count indictment for conspiracy to possess with intent to distribute 5 grams or more of cocaine base.

---

1. In this Court's experience, the great majority of drug cases are brought against relatively low-level participants in the chain of drug commerce.

Both men sell these relatively small quantities of drugs to support their drug habits, which began for both men in their 20s. (Riley was born in 1969; King in 1982). Both men have prior criminal histories that place them in a Criminal History Category V under the U.S. Sentencing Guidelines ("the Guidelines"). Pursuant to the Pre-sentence Report, Riley is being held accountable for 8 grams of cocaine base, while King is being held accountable for 13.2 grams, even though their participation in the conspiracy is relatively indistinguishable. After giving each Defendant three credits for acceptance of responsibility,[2] these Defendants score as follows:

Under the Guidelines, Riley's score is Total Offense Level 21, Criminal History Category V, resulting in a sentencing range of 70–87 months imprisonment. The Government recommends a downward departure for Riley pursuant to Guidelines § 5K1.1 for providing substantial assistance. In essence, this assistance amounted to his willingness to testify against his co-Defendant, King.[3]

King scores at Total Offense Level 23, Criminal History Category V, producing a sentencing range of 84–105 months.

On June 24, 2004, the Supreme Court ruled that the Washington state statutory procedure for sentencing violated the Sixth Amendment of the Constitution. *Blakely,* —— U.S. at ——, 124 S.Ct. at 2538. The question now plaguing the federal courts is how *Blakely* affects the Guidelines. This Court addresses that issue below.

## II. Legal Analysis

### A. Does Blakely Apply to the Federal Sentencing Guidelines

Writing for the majority,[4] Justice Scalia stated in a now rather famous footnote in *Blakely:* "The Federal Guidelines are not before us, and we express no opinion on them." —— U.S. at —— n. 9, 124 S.Ct. at 2538 n. 9. Despite Justice Scalia's deflection of what some maintain is the *real* issue,[5] courts around the country are weighing in. Among them, little consensus exists, and thus the sort of "havoc" envisioned and feared by Justice O'Connor has in fact ensued. *Id.* at 2549 (O'Connor, J., dissenting) ("The Court ignores the havoc it is about to wreak on trial courts across

---

**2.** Section 3E1.1 of the Guidelines essentially rewards a defendant who agrees to forego his constitutional right to trial by pleading guilty. This is a powerful incentive to induce plea bargaining.

**3.** There is no inherent logic or fairness in the plea bargaining process as it relates to § 5K1.1. Usually, it is simply a matter of which defendant sings first, i.e., the early bird gets the worm.

**4.** In *Blakely,* Justice Scalia authored the majority opinion. Justices O'Connor, Kennedy, and Breyer wrote separate dissents. Justice Breyer joined Justice O'Connor's dissent, and vice versa. Chief Justice Rehnquist and Justice Kennedy joined in part with Justice

O'Connor's dissent. Justice Breyer joined in Justice Kennedy's dissent.

**5.** Justice O'Connor chastised, "It is no answer to say that today's opinion impacts only Washington's scheme and not others, such as, for example, the Federal Sentencing Guidelines." —— U.S. at ——, 124 S.Ct. at 2549; *see also United States v. Penaranda,* 375 F.3d 238, 239–40 (2d Cir.2004) ("In the most general sense, our question is whether the *Blakely* decision applies to the federal Sentencing Guidelines."). In *Penaranda,* the Second Circuit did not draw any conclusions regarding *Blakely's* impact on the Guidelines but instead certified certain discrete questions to the Supreme Court.

the country.").[6]

■ After considered reflection, this Court sides with the majority[7] of other Circuit and District courts, which have found that *Blakely* applies to the Guidelines. *See, e.g., United States v. Montgomery*, 2004 WL 1562904 (6th Cir. July 14 2004); *United States v. Booker*, 375 F.3d 508, 2004 WL 1535858 (7th Cir.2004); *United States v. Landgarten*, 325 F.Supp.2d 234, 2004 WL 1576516 (E.D.N.Y.2004);[8] *United States v. Einstman*, 325 F.Supp.2d 373 (S.D.N.Y.2004); *United States v. Toro*, 2004 WL 1575325 (D.Conn. July 8, 2004); *United States v. Montgomery*, 324 F.Supp.2d 1266, 2004 WL 1535646 (D.Utah 2004); *United States v. Croxford*, 324 F.Supp.2d 1230 (D.Utah 2004) ("*Croxford I* "); *United States v. Lamoreaux*, 2004 WL 1557283 (D.Mo. July 7, 2004); *United States v. Medas*, 323 F.Supp.2d 436 (E.D.N.Y.2004); *United States v. Shamblin*, 323 F.Supp.2d 757 (S.D.W.Va. 2004); *United States v. Gonzalez*, 2004 WL 1444872 (S.D.N.Y. June 28, 2004); *United States v. Ducan Fanfan*, 03–47–P–H, Partial Transcript of Sentencing Hearing of 6/28/04.[9]

6. Of course, just because an opinion may cause havoc is not reason enough to withhold its issuance. Many courts, however, would welcome quick clarification from the Supreme Court to alleviate the confusion.

7. To date, the Fifth Circuit stands alone among the Circuits in ruling that *Blakely* does not apply to the Guidelines. *See United States v. Pineiro*, 377 F.3d 464 (5th Cir.2004). The Fifth Circuit ultimately found that *Blakely* does not apply because the Sentencing Commission is a promulgating agency rather than a legislature, and the Guidelines are a set of binding rules rather than legislatively enacted statutes.

The Eleventh Circuit has not yet written on the effects of *Blakely* but it seems likely, based on *Spero v. United States*, 375 F.3d 1285, 1286 (11th Cir.2004) (*per curiam* ) ("Whatever other effect the Supreme Court's recent decision in *Blakely v. Washington* may have, it does not undermine the validity of minimum mandatory sentences, at least not where the enhanced minimum does not exceed the non-enhanced maximum."), and *In re Dean*, 375 F.3d 1287, 1290 (11th Cir.2004) (finding that *Blakely* was not retroactive to cases already final on direct review), that it will at least find that *Blakely* applies to the federal Guidelines.

8. Judge Weinstein did not expressly rule that *Blakely* applied to the Guidelines but did so by implication. He determined that a sentencing jury trial would be held "to decide whether the enhancement factors are proved beyond a reasonable doubt." at 234–35. *But*

*see United States v. Croxford*, 324 F.Supp.2d 1230, 1242–43 (D.Utah 2004) ("*Croxford I* ") (calling into question the wisdom and legality of convening sentencing juries).

9. In addition, just days before *Blakely* was decided, Chief Judge Young of Massachusetts ruled that the Guidelines are unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). *See United States v. Green*, —— F.Supp.2d ——, 2004 WL 1381101 (D.Mass.2004). The sum of his opinion can be found in this passage: "the Sixth Amendment guarantee of trial by jury has been eroded as never before in the history of our nation, while the institutional judiciary complacently slips into forms of expression and modes of thought that unconsciously reinforce the Department agenda in a powerfully Orwellian way." *Id.* at ——, 2004 WL 1381101, *3. Of course, Judge Young not only found the Guidelines unconstitutional but also decried the state of the entire criminal justice system, focusing primarily on the extraordinary use of the plea bargain, the unprecedented control in the hands of the prosecutor, and the Feeney Amendment. *See id.* at —— –– ——, *6–9 (detailing how the Government in today's system establishes the sentence and the federal judge simply imposes it) and at *12 (calling the Feeney Amendment the "saddest and most counterproductive episode in the evolution of federal sentencing doctrine.").

### 1. Supreme Court Precedent Does Not Address the Sixth Amendment Issues of *Blakely*

To be sure, the Guidelines have previously withstood significant Supreme Court scrutiny and have come out on the winning side. *See, e.g., Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989); *Stinson v. United States,* 508 U.S. 36, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993); *Witte v. United States,* 515 U.S. 389, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995); *Edwards v. United States,* 523 U.S. 511, 118 S.Ct. 1475, 140 L.Ed.2d 703 (1998); *United States v. Watts,* 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997). The Guidelines have not, however, faced a Sixth Amendment right-to-jury-trial challenge such as the one mounted in *Blakely* against the Washington state scheme.[10] *See Booker,* 375 F.3d 508, 513–14 (advising that the Supreme Court has not upheld the Guidelines against Sixth Amendment challenges in *Edwards* or any other pre-*Blakely* case); *United States v. Pineiro,* 377 F.3d 464, 470–73 (5th Cir.2004) (admitting

that Supreme Court precedent does not address Sixth Amendment trial-by-jury issues);[11] *United States v. Croxford,* 324 F.Supp.2d 1255, 1260, 2004 WL 1551564 at *4 (D.Utah July 12, 2004) ("*Croxford II* ") ("In sum, none of the Supreme Court cases on the Federal Sentencing Guidelines even discuss—much less decide—the Sixth Amendment jury trial issue presented here."). For this reason, this Court views *Blakely* as binding Supreme Court precedent with respect to the constitutionality of the Guidelines. *Einstman,* at 378–80 (justifying its pronouncement on the effects of *Blakely* and commenting that prior Supreme Court cases simply do not address "the issue that underlies *Blakely.*"); *but see Booker,* 375 F.3d 508, 515–18 (Easterbrook, J., dissenting).

### 2. The Guidelines and the Washington State Scheme Are Indistinguishable for Constitutional Purposes

The Court further holds that, for constitutional purposes, the Guidelines are indis-

---

**10.** The Government argues in its "model brief"(as submitted in *Croxford* ) that Supreme Court precedent prevents this Court from finding *Blakely* applicable to the Guidelines. *See United States v. Croxford,* 324 F.Supp.2d 1255, 1257–60 (D.Utah 2004) ("*Croxford II* "). As other courts have pointed out, however, none of the prior cases have ruled on the discrete issue now before us. *Id.* Indeed, *Mistretta* held, under separation of powers and delegation of legislative authority challenges, that the Sentencing Commission was not improper. 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714. *Stinson* held that the commentary in the Guidelines manual was binding and authoritative. 508 U.S. 36, 113 S.Ct. 1913, 123 L.Ed.2d 598. In *Witte,* the Court found that the Double Jeopardy Clause was not implicated by judges' consideration of relevant conduct in determining a sentence "within the legislatively authorized punishment range …" 515 U.S at 406, 115 S.Ct. 2199, and in *Edwards,* it held that the Guidelines require the sentencing judge to determine the amount and type of drugs involved

in a drug conspiracy but not in the face of a Sixth Amendment or right-to-jury-trial challenge. 523 U.S. 511, 118 S.Ct. 1475, 140 L.Ed.2d 703. *Watts* held that a sentencing court may consider conduct underlying an acquitted charge in a sentence, so long as the conduct was proven by a preponderance of the evidence. 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554.

**11.** After surveying Supreme Court precedent, the Fifth Circuit said: "These cases, and others like them, do not discuss the Sixth Amendment right to a jury trial, and we do not pretend otherwise." *Pineiro,* at 472–73. With that assessment, this Court agrees. Where *Pineiro* and this Court differ, however, is that *Pineiro* went on to imply that Supreme Court precedent had employed, and will continue to employ, the vision that the "United States Code, *and not the Guidelines,* establishes maximum sentences for offenses." *Id.* (emphasis in original). As explained *infra,* that argument is overly formalistic.

tinguishable from the Washington state statutory scheme at issue in *Blakely*. Justice Scalia wrote, in a now oft-quoted key line of *Blakely:*

> the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* finding additional facts. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds his proper authority.

—— U.S. at ——, 124 S.Ct. at 2537 (citations omitted). Some, including the Government, (*see Croxford II*, at 1261–62), suggest that Justice Scalia's use of the phrase "statutory maximum" is literal and indicates that the Court did not intend *Blakely*—which involves a state statutory scheme enacted by a legislature—to apply to the Guidelines, which are rules promulgated by an agency. *See United States v. Penaranda*, 375 F.3d 238, 239–40 (2d Cir. 2004) ("A common characteristic of *Apprendi, Ring,* and *Blakely* is that a state

legislature had made the critical decisions setting the boundaries that the Court held the sentencing judge was not permitted to exceed without either a jury's fact-finding or a defendant's admission."). As others have opined, however, distinguishing the Guidelines from the state statutory scheme in *Blakely* in this manner puts form over substance. Looking, as we must, at the effect of the regime rather than its label,[12] it becomes clear that the Guidelines function as the equivalent of statutory directives and therefore are indistinguishable in any relevant way from the Washington statutory scheme addressed in *Blakely. See Blakely,* —— U.S. at ——, 124 S.Ct. at 2550 (O'Connor, J. dissenting) ("The structure of the Federal Guidelines likewise does not, as the Government half-heartedly suggests,[13] provide any grounds for distinction. Washington's scheme is almost identical to the upward departure regime established by 18 U.S.C. § 3553(b) and implemented in USSG § 5K2.0. If anything, the structural differences that do exist make the Federal Guidelines more vulnerable to attack.") (internal citations omitted); *id.* at 2561 (Breyer, J., dissenting) ("Perhaps the Court will distinguish the Federal Sentencing Guidelines but I am uncertain how."); *Einstman,* at 375 ("there is very little difference between the two systems, and what difference there is does not bode

---

**12.** Indeed, the Supreme Court has always counseled that the salient point is not the form of the scheme or its origin but rather the effect of the scheme on sentencing. *Apprendi,* 530 U.S. at 494, 120 S.Ct. 2348 ("the relevant inquiry is not one of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?"); *Toro,* 2004 WL 1575325 at *6.

**13.** In its *amicus curiae* brief in *Blakely,* the United States "note[d] differences between Washington's sentencing regime and the Fed-

eral Sentencing Guidelines but question[ed] whether those differences are constitutionally significant." —— U.S. at ——, 124 S.Ct. at 2538 n. 9. As Justice O'Connor pointed out, the United States' argument that the Guidelines differed from Washington's scheme was half-hearted. Now, the United States argues that the differences *are* constitutionally significant. The Government's shifting position suggests that its current attempt to avoid *Blakely's* application to the Guidelines also may be half-hearted.

well for the constitutionality of the [Guidelines].”); *Croxford II*, at 1261–62; *Shamblin*, at 764–66. Thus, despite the linguistic rubric under which courts have been operating for years, the “Guidelines” are not in fact intended simply to “guide” but rather to bind judges in a way only a rule or statute can. *See Croxford II*, at 1261–62 (“In other words, the Federal Sentencing Guidelines are ‘guidelines’ in name only.”). The Guidelines therefore operate as a statutory mandate, and they are not distinguishable from the Washington state scheme on this formalistic ground.

The Second Circuit further hypothesizes, and the Government argues,[14] that “the distinct administrative provenance of the federal Sentencing Guidelines may place them outside the ambit of the *Blakely* principle.” *Penaranda*, 375 F.3d 238, 244–45. This notion has suffered rejection. Justice O’Connor stated: “The fact that the Federal Sentencing Guidelines are promulgated by an administrative agency nominally located in the Judicial Branch is irrelevant to the majority’s reasoning. The Guidelines have the force of law, and Congress has unfettered control to reject or accept any particular guideline.” *Blakely*, —— U.S. at ——, 124 S.Ct. at 2549 (internal citations omitted); *see also Booker*, 375 F.3d 508, 510–11 (“it is hard to believe that the fact that the guidelines are promulgated by the U.S. Sentencing Commission rather than by a legislature can make a difference. The Commission is exercising power delegated to it by Con-

gress, and if a legislature cannot evade what the Supreme Court deems the commands of the Constitution by a multistage sentencing scheme neither, it seems plain, can a regulatory agency.”); *Croxford II*, at 1263 (“The constitutionally relevant question, however, is what difference it makes that the federal Guidelines are initially promulgated by an independent agency while the Washington guidelines were adopted by a legislature. . . . the net effect is the same: both the Sentencing Commission and the Washington legislature produced legally binding sentencing directives.”). A New York judge succinctly stated: “The Sentencing Guidelines may be no more than ‘sentencing rules’ that are ‘binding on sentencing courts by statute,’ but that description equally fits the sentencing law adopted by the Washington State Legislature. By having the Legislature create the grid, instead of having the Legislature create the Commission that creates the grid, all Washington did was eliminate the middle man.” *Einstman*, at 377–78 (citations omitted). For all these reasons, therefore, the Court finds *Blakely* applicable to the Guidelines.

**3. Can Courts Harmonize Blakely with the Guidelines, or Are They Unconstitutional in their Entirety?**

 Having found that *Blakely* applies to the Guidelines, the next question becomes: is the entire Guidelines scheme unconstitutional, or may the unconstitu-

---

**14.** In its *Blakely amicus curiae* brief, the Government admitted that the Sentencing Commission was accountable to Congress, which could revoke or amend any or all of the Guidelines as it saw fit. Moreover, the Government pointed out, Congress has in fact exercised its authority to amend the Guidelines and to bypass the Commission at times. A federal judge in Maine quoted the Solicitor General’s brief: “Moreover, the Sentencing Commission exercises authority delegated by Congress, and the Guidelines are binding legislative rules. Thus, it is not entirely clear that the administrative nature of the Guidelines will insulate them from *Apprendi*.” *See Ducan Fanfan*, 03–47–P–H, Partial Transcript of Sentencing Hearing of 6/28/04 at 102 (citing Solicitor General’s brief).

tional enhancement aspects be severed? For reasons stated in *Einstman* and *Croxford*, this Court finds the Guidelines to be a non-severable whole. *Einstman*, at 379–80; *Croxford I*, at 1244–45. Furthermore, because the Guidelines are not severable, "the unconstitutionality of the provisions concerning the judicial fact-finding of sentencing enhancements necessarily means that the entire [Guidelines] scheme falls." *Einstman*, at 379–80. In this Court's view, the unavoidable result of finding the Guidelines unconstitutional in their entirety is a return to an indeterminate system. In this regard, the Court therefore agrees with and adopts the approach of the Sixth Circuit. *See Montgomery*, 2004 WL 1562904. In that case, the Sixth Circuit interpreted *Blakely* as holding that " 'determinate' or fixed rule-bound sentencing, like the Federal Sentencing Commission's system, which increases sentences based on a requirement of judicial fact-finding instead of jury fact-finding, violates the trial-by-jury requirement of the Sixth Amendment." *Id.* at *2. As a result, the Guidelines must be discarded in favor of "an indeterminate system in which the Federal Sentencing Guidelines in fact become 'guidelines' in the dictionary-definition sense . . . ." *Id.; see also Einstman*, at 381 (reverting to an indeterminate sentencing scheme after finding the Guidelines unconstitutional). As the Sixth Circuit noted, the majority opinion in *Blakely* "made it clear that an indeterminate sentencing system administered by judges whose hands are not tied, as was the case prior to the imposition of the present system in 1987 by the Federal Sentencing Commission, does not violate the Sixth Amendment." 2004 WL 1562904 at *2. Indeed, Justice Scalia [15] wrote:

> First, the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury. Indeterminate sentencing does not do so. It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty. Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence—and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned.

*Blakely*, —— U.S. at ——, 124 S.Ct. at 2540 (emphasis in original).[16]

---

**15.** Justice Scalia's opinion in *Blakely* might come as no surprise, given his concurrence in *Apprendi*, in which he stated that the right to a jury trial "has no intelligible content unless it means that all the facts which must exist in order to subject the defendant to a legally prescribed punishment *must* be found by the jury." *Apprendi*, 530 U.S. at 499, 120 S.Ct. 2348 (Scalia, J., concurring); *see also Green*, —— –——, 2004 WL 1381101 at *22–23 (discussing Justice Scalia's rationale in *Apprendi* ).

**16.** This passage tees up the question raised by Justices O'Connor and Breyer and other jurists regarding the continued validity of determinate systems under Justice Scalia's approach. Justice O'Connor wrote: "Under the majority's approach, any fact that increases the upper bound on a judge's sentencing discretion is an element of the offense. Thus, facts that historically have been taken into account by sentencing judges to assess a sentence within a broad range—such as drug quantity, role in the offense, risk of bodily harm—all must now be charged in an indict-

Taking *Blakely* to its logical conclusion, the determinate scheme set up by the Guidelines violates the Constitution and can no longer be used in any case.[17] The Court notes, however, that despite a return to an indeterminate sentencing scheme, it will continue to rely on the Guidelines as recommendations worthy of serious consideration. *Montgomery*, 2004, WL 1562904 at *3.[18] Indeed, this Court welcomes guidance for its sentencing duties and will continue to look to the Guidelines to help craft just, reasonable, proportionate sentences for each defendant, and to help ensure uniformity amongst sentences.[19] *See Einstman*, at 381 ("There is far too much wisdom in the Guidelines, practical as well as theoretical, for any sensible jurist to ignore them.").

In returning to an indeterminate system, this Court recognizes that it is not following the majority of post-*Blakely* decisions. Several courts have held that application of the Guidelines violates the Sixth Amendment in those cases in which *Blakely* is implicated, but that in cases involving no enhancements (i.e., no judicial fact findings that increase the sentence), the Guidelines may be applied without of-

---

ment and submitted to a jury." *Blakely*, —— U.S. at ——, 124 S.Ct. at 2546 (O'Connor, J., dissenting); *see also id.* at 2551 (Breyer, J., dissenting) ("Thus, a jury must find not only the facts that make up the crime of which the offender is charged, but also all (punishment-increasing) facts about the *way* in which the offender carried out that crime.") (emphasis in original); *Green*, ——–——, 2004 WL 1381101 at *23–24 ("If the state wants proof of a fact to give it more power over an individual's liberty, it must submit that fact to a jury and prove it beyond a reasonable doubt.... if as a matter of law the finding of a fact allows the judge to inflict greater punishment than she could inflict in the absence of such a finding, that fact is an element and must be proved to a jury beyond a reasonable doubt.").

It is not altogether clear which system, determinate or indeterminate, Justice Scalia would endorse. Consider this passage from the majority opinion in *Blakely:*

By reversing the judgment below, we are not, as the State would have it, 'find[ing] determinate sentencing schemes unconstitutional.' This case is not about whether determinate sentencing is constitutional, only about how it can be implemented in a way that respects the Sixth Amendment.... In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking 40 years in jail. In a system that punishes burglary with a 10–year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is *entitled* to no more than a 10–year sentence—and by rea-

son of the Sixth Amendment the facts bearing upon that entitlement must be found by a jury.

124 S. Ct. at 2540 (emphasis in original).

17. At the July 19, 2004 hearing in this case, defense counsel for both Defendants (belatedly) moved to declare the Guidelines unconstitutional. The Court granted that motion.

18. The Sixth Circuit further suggests that the enabling act for the Guidelines "would have allowed the creation of an indeterminate system in which the guidelines are simply considerations" and that the Sentencing Commission is responsible for morphing the system into a determinate one. *Montgomery*, 2004 WL 1562904 at *3.

19. This procedure might help ease Justice O'Connor's fear regarding the former indeterminate "system of unguided discretion [that] inevitably resulted in severe disparities in sentences received and served by defendants committing the same offense and having similar criminal histories." *Blakely*, —— U.S. at ——, 124 S.Ct. at 2544 (O'Connor, J., dissenting). Of course, one could argue that, the way the plea bargain system operates under the Guidelines regime still results in similarly situated defendants receiving vastly disparate sentences. *See Green*, ——–——, 2004 WL 1381101 at *6–9 (discussing charge bargaining, fact bargaining, and other mechanisms of plea bargaining that contribute to disparate sentences and unfairness).

fending the Sixth Amendment. *See, e.g., United States v. Booker,* 375 F.3d 508 (7th Cir.2004) (allowing for application of the Guidelines in some cases but not others *unless* the Guidelines as a whole are invalid, and reserving ruling on the issue of severability); *Montgomery,* at 1271 (deciding to "continue to apply the sentencing guidelines, but without additional fact-finding by the Court that might result in an upward enhancement or departure that would result in a sentence above that which would otherwise apply under the guidelines, absent those findings. The Court wishes to clarify, however, that enhancements may be constitutionally appropriate under *Blakely* if they · are based upon facts admitted by Defendant or found by a jury, or if based upon the fact of a prior conviction."); *Croxford I,* at 1241 ("Where the Guidelines can be applied without additional factual findings by the court beyond those found by a jury (or perhaps admitted as part of a plea proceeding), the Guidelines will still apply.").[20]

■ The suggestion that courts use the Guidelines in some cases but not others is at best schizophrenic and at worst contrary to basic principles of justice, practicality, fairness, due process, and equal

protection. Courts simply cannot apply a determinate sentencing code to one defendant whose sentence raises no judicial fact-finding enhancement issues and a separate discretionary scheme to another defendant whose sentence does raise enhancement issues. Such a structure not only seems to violate equal protection principles[21] but would lead to the perverse result that both Government and criminal defense attorneys would plot to finagle their way into the determinate system or indeterminate system depending on the judge and the various factors relevant to the particular defendant's sentence. Consider, for example, two defendants charged in a one-count drug conspiracy involving the same amount of drugs and similar criminal histories, who would score, under the Guidelines, at a Total Offense Level of 21, Criminal History V (sentencing range of 70–87 months). Assume also that one of the defendants possessed a weapon which, under Guideline § 2D1.1(b)(1), would result in a two-level enhancement. Under the proposed dual scheme, one defendant would receive a Guidelines sentence of between 70–87 months, while the more culpable defendant would qualify for a lower indeterminate sentence. Such a prospect is inherently inconsistent with the basic

---

**20.** Some other courts continue to apply the Guidelines but hand down sentences based upon the offense of conviction and prior convictions. *See, e.g., Green,* —— ——, 2004 WL 1381101 at * 37; *Shamblin,* at 766 (sentencing under the Guidelines based only on amounts of offense conduct and relevant conduct admitted by the defendant or proven to a jury and acknowledging "that this is an artificial application of the Guidelines.").

**21.** This Court is not the first to address a potential equal protection problem with this dual system of sentencing. In *United States v. Thompson,* 324 F.Supp.2d 1273 (D.Utah 2004), the defendant argued that the Guidelines could not be applied only in certain

cases in which *Blakely* is not implicated because it would resemble a " 'cart missing a wheel' " and would violate equal protection. *Id.* at 2533. The court rejected the defendant's arguments regarding equal protection because "Many similarly situated criminal defendants end up with different sentences because of constitutional constraints without any equal protection concern." *Id.* at 2536. To this Court, *Thompson's* answer is really no answer at all. The real question, as identified above, is whether courts simultaneously may administer two separate sentencing systems, not whether every similarly situated criminal defendant ends up with the identical sentence. *Thompson* did not address that issue.

principles upon which the Guidelines were promulgated. For all these reasons, this Court wholly rejects the dual system option.

With the new indeterminate scheme in mind, the Court now turns to the sentencing of the defendants at bar.[22]

### III. Sentencing in the Instant Case in Light of *Blakely*

Under the U.S.Code, King and Riley each face a mandatory term of imprisonment of 5 years and a maximum term of 40 years. 21 U.S.C. § 841(b)(1)(B).

As to Riley, the Government recommends: 1) downward departure pursuant to Section 5K1.1 of the Guidelines; or 2) imposition of sentence below the statutory minimum pursuant to 18 U.S.C. § 3553(e); or 3) both. Since the Guidelines are no longer mandatory, the Court turns to Section 3553(e). That statute states:

> Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense. Such sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28, United States Code.

*Id.* In the case of Riley, the Government has filed said motion, and hence the Court has authority to impose a sentence below the statutory minimum of 60 months for Riley's substantial assistance in the prose-

cution of King. Using the Guidelines for guidance, the Court grants the Government's motion and sentences Riley to 48 months.

As to King, the Court imposes a sentence of 60 months, the statutory mandatory minimum. 21 U.S.C. § 841(b)(1)(B). Written judgments will be entered for each Defendant in conjunction with this Opinion.

---

**22.** The Government raised many questions at the sentencing hearing, which were noted for the record. The Court expects numerous questions to arise as a result of *Blakely* and this Court's ruling. Indeed, this Opinion may just scratch the surface of what is to come.